(No. 70247.-▇▇▇▇▇

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY MITCHELL, Appellant.

*Opinion filed October 15, 1992.—Rehearing denied November 30, 1992.*

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Marcia L. Friedl, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

On August 4, 1989, defendant, Anthony Mitchell, was indicted on two counts of first degree murder in the stabbing deaths of David and Dawn Lieneke. (Ill. Rev.

Stat. 1987, ch. 38, par. 9—1(a)(1).) The murders occurred on July 4, 1989. Following a jury trial in the circuit court of St. Clair County, defendant was convicted on both counts. The trial proceeded to the death penalty phase, and the same jury found defendant eligible for the death penalty because defendant murdered two people, a statutory aggravating circumstance. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(3).) The jury next determined that there were no mitigating factors sufficient to preclude the imposition of the death penalty and the trial court sentenced defendant to death. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).) Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rules 603, 609(a).

On July 4, 1989, police were called to the Symonds Mobile Home Park near Belleville, Illinois, to investigate the murders of David and Dawn Lieneke. David and Dawn, brother and sister, were found stabbed to death around 10:30 p.m. in their grandparents' mobile home where they also lived. The police were soon informed that a car had been seen in the mobile home park the night of the murders, and were given its description and license number. The police traced the car to defendant's sister and went to her address to investigate. Defendant's sister informed the police that defendant had used the car the night before. The police then questioned defendant and defendant subsequently confessed to the murders. The murder weapon and other physical evidence were later found in defendant's basement. Additional facts will be presented where necessary to address the specific issues.

On appeal, defendant argues: (1) the prosecutor engaged in purposeful racial discrimination by employing three peremptory challenges to exclude three black members of the venire from the jury; (2) the police violated his rights under the fourth and fourteenth amend-

ments right to be free from unreasonable searches and seizures where they subjected him to custodial interrogation without probable cause to arrest, and the trial court erred in failing to recall testimony at the suppression hearing that defendant was not free to leave the police interrogation; (3) his confession was involuntary and thus in violation of his fifth amendment right to be free from compelled self-incrimination; (4) a new suppression hearing is required because the State adduced evidence at the suppression hearing that defendant failed a polygraph examination; (5) he was denied his right to a fair trial because the prosecutor elicited testimony concerning his belief that he was a "Ninja" and that he possessed weapons unrelated to the murders; (6) he was subjected to cruel and unusual punishment under the eighth and fourteenth amendments, and to a fair and reliable penalty determination, because the prosecutor inflamed the jury by stressing that the victims left behind family and friends, and diverted the jurors' attention by playing on the jurors' fear of God and their good standing in the community; (7) he was denied a fair and reliable sentencing hearing because the prosecutor sent to the jury life and death photographs of the victims and asked the jury to look at the photographs in making its determination of whether he should live or die; (8) he was denied his right to a fair sentencing hearing where a defense witness engaged in extra-record communication with a juror prior to jury deliberations at the second stage of capital sentencing and the juror failed to report the incident to the court until after sentencing; (9) he was denied a fair death penalty hearing because the trial court admitted and sent to the jury a copy of the presentencing report which had aggravating factors highlighted; (10) the Illinois death penalty statute is unconstitutional because it precludes meaningful consideration of mitigation; and (11) the Illinois death penalty statute is

unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. We affirm defendant's convictions and sentence.

## I

Defendant's first argument on appeal is that the State violated his right to equal protection of the laws under the fourteenth amendment when the prosecutor engaged in purposeful racial discrimination by employing three peremptory challenges to exclude three black venirepersons from the jury. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) *Batson* held that the equal protection clause of the fourteenth amendment forbids prosecutors from using peremptory challenges to strike potential jurors solely on the basis of their race.

Before we address defendant's *Batson* claim, we first address the State's argument that defendant has waived this issue for review, as he failed to include the issue in his post-trial motion. In support of its argument, the State cites *People v. Enoch* (1988), 122 Ill. 2d 176, and *People v. Harris* (1990), 195 Ill. App. 3d 507. In *Enoch*, this court stated that for an issue to be preserved for appellate review, it must be included in a post-trial motion. (*Enoch*, 122 Ill. 2d at 186-88.) In *Harris*, the appellate court found a *Batson* claim waived where the defendant had made timely objection to the State's exercise of peremptory challenges but had failed to include the issue in a post-trial motion. (*Harris*, 195 Ill. App. 3d at 511.) Defendant notes, however, that while the *Harris* court found the *Batson* issue waived, other courts have considered *Batson* claims under similar circumstances. See *People v. Whaley* (1989), 184 Ill. App. 3d 459; *People v. Mitchell* (1987), 163 Ill. App. 3d 58; *People v. Brown* (1987), 152 Ill. App. 3d 996.

In *Enoch*, while this court found that an issue must be raised in a post-trial motion to preserve the issue for review, the court also stated:

"Our constitution requires that this court review all cases in which a sentence of death is imposed. (Ill. Const. 1970, art. VI, §4(b).) However, our constitutional obligation to review death penalty cases does not require us to review every issue raised on appeal when the issues are not properly preserved by an objection in the trial court and a written post-trial motion. In *Porter* and *Caballero* this court noted that although death penalty cases are required by our constitution to be reviewed by this court, trial counsel nonetheless has an obligation to see that the statute requiring a post-trial motion is complied with so that the review will be limited to issues of some significance. Although we have not heretofore defined the limits of such a review, we now hold that when the defendant fails to comply with the statutory requirement to file a post-trial motion, our review will be limited to *constitutional issues which have properly been raised at trial and which can be raised later in a post-conviction hearing petition (Ill. Rev. Stat. 1983, ch. 38, par. 122–1), sufficiency of the evidence, and plain error.*" (Emphasis added.) *Enoch*, 122 Ill. 2d at 190.

A *Batson* claim is clearly an issue which can be later raised in a post-conviction hearing petition (see Ill. Rev. Stat. 1991, ch. 38, par. 122–1), and defendant raised the issue at trial. We thus review defendant's *Batson* claim. Otherwise, defendant would later raise the issue in a post-trial motion. We also note that while *Enoch* involved a defendant who failed to file a post-trial motion, this analysis also applies to those who file post-trial motions but fail to include specific issues.

We now address defendant's *Batson* claim. The record reveals that the venire consisted of 60 persons, eight of whom were black. The rest of the venire was either Hispanic or white. *Voir dire* consisted of general questioning of all the jurors, and then specific questioning of

the jurors, two at a time, in the judge's chambers. Of the eight black members of the venire, two were dismissed for cause after general *voir dire*. As specific *voir dire* began in the judge's chambers, defense counsel moved to dismiss the venire for not being representative of St. Clair County. Defense counsel noted that St. Clair County was 24 to 25% black, but that only eight of 60 potential jurors (11.7%) were black. The trial court asked defense counsel if he wished to argue that St. Clair County's selection process was discriminatory. Defense counsel stated he would file a motion later. After looking into the matter, however, defense counsel informed the judge that he would not file any motion concerning the selection of the venire.

The first black venireperson called into the judge's chambers for *voir dire*, Lorene Crisp, was accepted for the jury. The second black venireperson, Novie McGruder, was stricken by the State using a peremptory challenge. The next black member of the venire called into the judge's chambers, Gary Webster, was chosen for the jury, while the fourth black venireperson, Howard Jones, was stricken by the State using a peremptory challenge. Finally, the State struck the fifth black member of the venire interviewed in the judge's chambers, Arnette Powe, using a preremptory challenge. Powe was questioned for a seat as an alternate juror. In all, the State used 12 peremptory challenges during jury selection, three against black members of the venire. Two black venirepersons served on the jury.

Immediately after the jury had been chosen, defense counsel stated the name of each black venireperson and noted whether they had been chosen for jury duty or stricken. Defense counsel did this to "preserve for the record" a *Batson* issue. The court asked defense counsel if he thought a *prima facie* showing had been made that the State had discriminated in the use of its peremptory

challenges against black jurors, and defense counsel replied that he did. Defense counsel then stated that he saw no reason for the State to exercise peremptory challenges against McGruder, Jones, and Powe, except for the fact that they were black. The trial court, without determining whether a *prima facie* case had been presented, asked the State if it wished to comment on why the three jurors were excused. The State, not conceding that a *prima facie* showing had been made, offered the following explanations for its strikes.

The State explained it struck McGruder because she was very inattentive during the general *voir dire* and, in fact, appeared to be asleep at that time. The State also told the court that there was some indication that McGruder would hold the State to a higher burden given the fact that the death penalty might be imposed.

The State excused Howard Jones because he was a social worker who worked for the Department of Children and Family Services. The State also indicated that the "minor fact" that Jones' wife was a teacher assisted it in striking Jones. The State believed that Jones would have a liberal "social worker attitude." While acknowledging that Jones' answers to death penalty questions were appropriate, the State found Jones to have "pained" facial expressions during the death penalty portion of the questioning. The State acknowledged that Jones' pained facial expressions could have been a personality trait.

Finally, the State explained that it struck Arnette Powe because she indicated a strong desire to go to work. The State noted that Powe worked only on Tuesdays and Thursdays, and did not "want her mind on work" during the trial. Further, when the court explained that the State would seek the death penalty, Powe gave "all the right answers, [but] *** puckered up and made a sour face as if that was distasteful to her."

In response to these explanations, defense counsel informed the court that while Powe indicated her employer told her to ask the court if she could be relieved of jury duty, she indicated that she could put that out of her mind and concentrate on the trial. Defense counsel did not attempt to rebut any of the other explanations the State gave for striking the jurors.

The trial court then stated:

> "I don't believe, under the circumstances in this case, I have some real question [sic] as to whether a *prima facie* showing has been made, but based on the explanations given by the State, I don't find that there is anything to show a pattern of using peremptory challenges against the blacks that were on the panel. All of the explanations indicated neutral or a valid reason for exercising peremptory challenges."

On appeal, defendant contends that the trial court's finding concerning a *Batson* violation was manifestly erroneous. Defendant asks this court to reverse and remand for a new trial. We affirm the trial court's decision.

To prevail on a *Batson* claim, a defendant must first establish a *prima facie* case of discrimination. (*Batson*, 476 U.S. at 93-94, 90 L. Ed. 2d at 85-86, 106 S. Ct. at 1721.) Once a *prima facie* case has been established, the burden then shifts to the prosecutor to provide race-neutral explanations for striking the venire member in question. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) After this, defense counsel may rebut the prosecutor's reasons as being pretextual. (See *People v. Young* (1989), 128 Ill. 2d 1, 27.) The trial court then weighs the evidence in light of the *prima facie* case, the prosecutor's reasons for challenging the juror, and any rebuttal by defense counsel. (*People v. Harris* (1989), 129 Ill. 2d 123, 177.) The trial court's determination is a matter of fact, involving an evaluation of credibility, and

will thus be entitled to great deference on appeal. (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) Because of this, a trial court's decision will only be reversed if it is against the manifest weight of the evidence. *People v. McDonald* (1988), 125 Ill. 2d 182, 199.

In the instant case, the trial court never determined whether defendant established a *prima facie* case under *Batson*. However, the court did find that the State had neutral or valid reasons for exercising the peremptory challenges. We thus need only review the trial court's ruling that the State's reasons were valid or neutral, as the question of whether defendant established a *prima facie* case of racial discrimination became moot when the trial court found that the prosecutor's explanations for the challenges were valid and neutral. The United States Supreme Court recently explained:

> "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." (*Hernandez v. New York* (1991), 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.)

(See also *People v. Hope* (1992), 147 Ill. 2d 315, 325 (Miller, C.J., concurring in part and dissenting in part).) In *Hernandez*, the prosecutor stated his reasons for striking jurors immediately after the defendant raised his *Batson* claim, without waiting for a ruling on whether a *prima facie* showing had been made. The instant case is very similar to *Hernandez* in that the court asked the State, before the court had made a determination as to whether a *prima facie* showing had been made, if it cared to offer any statements concerning its challenges to the black members of the venire. We thus need not address whether a *prima facie* case has been

made under *Batson,* and only determine whether the trial court erred in finding the prosecutor's explanations for striking the three black jurors to be neutral and valid.

Before addressing the facts of the individual black venirepersons stricken by the State, defendant argues that the facts of this case create a compelling inference of purposeful discrimination. Defendant first notes that he is black and the victims were white. This court has considered the race of victims and defendants in determining whether a *Batson* violation exists. (*People v. Evans* (1988), 125 Ill. 2d 50, 66; *People v. Henderson* (1990), 142 Ill. 2d 258, 285-86.) Defendant also notes that many of the State's witnesses, including police officers who testified about his confession, are white. Courts have also considered the race of witnesses and defendants in determining whether a *Batson* violation exists. (*United States v. Mathews* (7th Cir. 1986), 803 F.2d 325, 332, *rev'd on other grounds* (1988), 485 U.S. 58, 99 L. Ed. 2d 54, 108 S. Ct. 883; *Young,* 128 Ill. 2d at 24.) Defendant then argues that both the Supreme Court and this court have noted that the fact that stricken venire members were heterogeneous, sharing only their race as a common characteristic, supports the inference that the prosecutor has used his peremptory challenges in a racially motivated manner. (*Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723; *McDonald,* 125 Ill. 2d at 196.) Defendant argues that the stricken black venirepersons only had their race as a common characteristic.

Defendant also argues that defense counsel indicated during jury selection that the fair cross section of St. Clair County was 24 to 25% black. In fact, defendant asserts, the cross section of St. Clair County is 27.5% black. (Illinois Statistical Abstract 358-59 (1990).) Defendant argues that while 27.5% of St. Clair County is black, only 14% of the jury and its alternates were

black. Defendant argues where a petit jury's racial composition fails to mirror the racial composition of the district from which that jury is drawn, an inference of purposeful racial discrimination arises under *Batson*. Defendant relies on *United States v. Woods* (4th Cir. 1987), 812 F.2d 1483, for this argument. The *Woods* court affirmed the trial court's finding of no *Batson* violation and noted, among others, that the racial composition of the petit jury closely approximated the district from which the jurors were drawn. (*Woods*, 812 F.2d at 1487.) We note that defendant does not argue that his sixth amendment right to a fair cross section of the community was violated.

We will keep these arguments which defendant notes in mind as we consider defendant's arguments concerning the individual jurors challenged by the State.

Defendant next attacks the State's explanations for striking each individual black venireperson. Before addressing the facts of each individual juror, we note that in justifying its challenges to the black members of the venire, the State's explanations need not rise to the level of a challenge for cause. However, a mere assertion of nondiscriminatory motive or of good faith will not suffice to rebut a *prima facie* case. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723-24.) The State may also not rebut a defendant's *prima facie* case by stating that it excused the venirepersons in question on the assumption that they would be sympathetic toward defendant because of their shared race. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) The prosecutor's reasons for excusing jurors of defendant's race must be " 'clear and reasonably specific,' " contain " 'legitimate reasons' for exercising the challenges," and be "related to the particular case to be tried." *Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88 & n.20, 106 S. Ct. at 1724 & n.20, quoting *Texas Department of Com-*

*munity Affairs v. Burdine* (1981), 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096.

## NOVIE McGRUDER

The State explained that it struck McGruder because she was very inattentive and appeared to fall asleep during the general *voir dire*, and that there was some indication she would hold the State to a higher burden of proof given the fact that this was a death penalty case. During questioning in the judge's chambers, McGruder was paired with Joseph Santos, who eventually served on the jury. The trial court questioned the two as follows:

"THE COURT: *** In the event since you understand that you may be asked to consider separate phases of eligibility for the death penalty, and then whether it should be imposed, do you think that the fact that you may be asked to consider those additional questions would in any way affect your ability to reach a fair and just verdict at the trial which is to determine his guilt or innocence? You understand what my question is, first of all?
JUROR McGRUDER: No.
THE COURT: I was afraid of that, after I got into it.
JUROR SANTOS: I thought I did, but—."

After the court clarified its question, both jurors stated that their decision of guilt or innocence would not be affected by the fact that they would later have to consider the death penalty. Later, the State's Attorney asked the two jurors the following:

"[STATE'S ATTORNEY]: *** [T]he judge has told all the jurors, and [defense counsel] and I have spoken about the State's burden of proving the defendant guilty beyond a reasonable doubt. That's the State's burden in this case. Would you hold the State to a higher burden just because there is a possibility that later on you might be or you are going to be asked possibly to impose a death penalty? I think that's really the question the

Judge was asking. Would you consider these in three different sections?

JUROR SANTOS: Right, I understand.

[STATE'S ATTORNEY]: Mrs. McGruder, did I confuse you more?

JUROR McGRUDER: Yes.

[STATE'S ATTORNEY]: Knowing that if the defendant—if the defendant is found guilty that you may probably be asked to consider other phases, would that affect your ability to decide during the trial?

JUROR McGRUDER: No.

[STATE'S ATTORNEY]: Would you listen to all the evidence, and if the State proves the defendant guilty beyond a reasonable doubt, would you find him guilty? That's what we are asking?

JUROR McGRUDER: If I listen to all the evidence?

[STATE'S ATTORNEY]: Even knowing that the death penalty is a possibility, does it trouble you, Miss McGruder?

JUROR McGRUDER: No, it doesn't trouble me."

Defendant objects to the State's challenge of McGruder and argues: (1) McGruder was not inattentive during *voir dire* in the judge's chambers; (2) the prosecutor's reason for striking McGruder, inattentiveness, was a pretext, as the white juror she was paired with, Santos, and another white juror, Beverly Blaies, were both confused and inattentive, and they both sat on the jury; and (3) there was no indication in the record that McGruder would hold the State to a higher burden of proof.

Defendant first argues that McGruder was not inattentive during *voir dire*, but instead showed attentiveness by requesting clarification of questions which the prosecutor acknowledged were confusing. Defendant appears to argue that McGruder was not inattentive during specific *voir dire* in the judge's chambers. The State, however, did not strike McGruder for inattentiveness during *voir dire* in the judge's chambers. Instead, the State told the court that McGruder was very inattentive

during general *voir dire* and that she, in fact, appeared to be asleep at this time. Defendant fails to respond to this claim.

Defendant next argues that two white jurors who served on the jury also demonstrated confusion and inattentiveness. Defendant first argues that the prosecutor confused Santos during questioning as well as McGruder. However, the record does not reveal this confusion, as the only answer Santos gave to the prosecutor was, "Right, I understand." Defendant probably intends to argue that the trial court confused Santos as well as McGruder during questioning. The record also does not necessarily reveal this to be true. When the court asked Santos and McGruder whether they understood his question, McGruder answered "No." Santos, however, replied that he thought he understood the court's question. Thus, it is not clear that Santos was confused by the trial court's question. Defendant even acknowledges later in his brief that Santos was not confused by a question (what question defendant refers to, however, is uncertain), where he states: "Santos heard the question and answered it without any hesitation."

Defendant also argues that another juror, Blaies, demonstrated similar inattentiveness during *voir dire* when she responded "Yes, I'm sorry" to a question. The record shows that after the court finished questioning Blaies and another juror in his chambers, the prosecutor directed six questions in a row towards the other juror, who answered all six questions. After this juror answered the sixth question, the trial court asked Blaies to respond to the sixth question as well. Blaies then responded "Yes, I'm sorry." Thus, rather than being inattentive, Blaies simply did not answer the question at first because it appeared the prosecutor meant to question only the other juror, and not Blaies.

Defendant also argues that Blaies expressed confusion over whether her prior knowledge of the case could prevent her from assessing only that evidence she heard in court. Blaies could not recall from what source she heard about the murders, and when asked by the trial court whether she would let any information she had heard affect her decision in the trial, Blaies responded that she did not understand the question. The court then told Blaies that she had previously answered the question phrased another way. The court then rephrased the question and Blaies answered "No." Thus, rather than being uncertain whether her previous knowledge of the case would prevent her from assessing only the evidence presented at trial, Blaies only indicated that she did not understand the court's phrasing of the question.

Even if defendant's argument's concerning Santos and Blaies were correct, this court has previously noted:

"[I]n many instances there will be no single criterion that serves as the basis for the decision whether to excuse a particular venireman. A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics." (*People v. Mack* (1989), 128 Ill. 2d 231, 239.)

Thus, a peremptory challenge is based on a combination of traits, and a juror possessing an unfavorable trait may be accepted while another juror possessing that same negative trait, but also possessing other negative traits, may be challenged. While confusion may be a negative factor in using a peremptory challenge, it is only one factor which defendant argues Santos and Blaies shared with McGruder. Not only did McGruder appear confused by the trial court's and prosecutor's questions, she was also inattentive and appeared to fall asleep during general *voir dire*. McGruder also gave some indication that she would hold the State to a higher burden of

proof because the death penalty might be imposed. Thus, McGruder was not similarly situated with Santos and Blaies.

Defendant finally argues that nothing in the record indicates that McGruder would have held the State to a higher burden of proof given the fact that this was a death penalty case. However, when the prosecutor asked McGruder and Santos about the State's burden, and whether they could consider the trial in three sections, McGruder appears to have given some indication that she was confused. After Santos replied, "Right, I understand," something prompted the prosecutor to ask McGruder whether she was confused. McGruder replied that she was confused. Later, McGruder seemed hesitant when asked if she would find defendant guilty if the State had proved defendant guilty and McGruder had listened to all the evidence. McGruder responded, "If I listen to all the evidence?" This hesitancy to answer this question, along with her earlier confusion about the question of holding the State to a higher burden, gave some indication to the prosecutor that McGruder did not know whether she would hold the State to a higher burden of proof. The fact that McGruder seemed to think about her decision and was confused before answering gave the State some indication that she might in fact hold the State to a higher burden of proof because of the possibility of the death penalty.

We note that one of the purposes of *voir dire* is to observe the demeanor of prospective jurors. A trial judge is in the best position to observe the demeanor of potential jurors and then evaluate prosecutive explanations for peremptory challenges. Because of this, the trial court's judgment will be given great discretion. (See *Young*, 128 Ill. 2d at 20-21.) Here, the State, defense counsel, and the trial court all observed McGruder's demeanor, and defense counsel did not attempt to rebut

the prosecutor's observations. The trial court found that the State's challenge of McGruder was not racially motivated, and on review, we cannot say that the trial court's finding was manifestly erroneous.

## HOWARD JONES

Defendant next argues that the prosecutor engaged in purposeful racial discrimination when he peremptorily challenged Jones. The prosecutor stated he struck Jones because he was a social worker for the Department of Children and Family Services who would have a liberal social worker attitude, had somewhat pained facial expressions during questions concerning the death penalty, and on a minor note, his wife was a teacher. Defendant argues (1) nothing in the record indicates that Jones had a liberal view on any matter, including criminal justice issues; (2) the prosecutor challenged Jones in part because his wife was a teacher, but another juror had a spouse who was a teacher, and a juror and alternate were teachers; and (3) the fact that the prosecutor struck a black member of the venire who was questioned for a seat as an alternate gives rise to the inference that Jones was challenged because of his race.

In arguing that Jones never indicated he held liberal views, defendant relies on *State v. Slappy* (Fla. 1988), 522 So. 2d 18. In *Slappy*, the prosecutor peremptorily challenged two black members of the venire because they were both assistant teachers and would thus possess liberal traits. The supreme court of Florida found a *Batson* violation in *Slappy* because even though the prosecutor demonstrated that the unfavorable trait, liberalism, was neutral and reasonable, the prosecutor failed to question the two challenged jurors on the grounds alleged for bias. The *Slappy* court thus found that the prosecutor failed to connect the undesirable trait to the challenged jurors. *Slappy*, 522 So. 2d at 23.

Defendant also relies on *Harris*, 129 Ill. 2d 123, where the defendant, relying on *Slappy*, argued that the State could not rely on assumptions concerning traits possessed by a broad group of people unless the State could show "(1) there is some element of truth supporting those assumptions and (2) those particular traits are possessed by the venireperson being excluded." (*Harris*, 129 Ill. 2d at 176.) Defendant asserts that while this court rejected this argument in *Harris*, this court nonetheless found the two factors important. (*Harris*, 129 Ill. 2d at 178.) Defendant argues that the trial court failed to ˙address these two important factors in the instant case.

However, as this court noted in *Harris*, under *Batson* a prosecutor need only "articulate a neutral explanation related to the particular case to be tried." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1724.) Once the prosecutor has given a neutral explanation, the defense may attempt to rebut the prosecution's explanations as being pretextual. (See *Young*, 128 Ill. 2d at 27.) Here, defense counsel never attempted to rebut the prosecutor's explanation concerning Jones as being pretextual. The *Harris* court also gave the following examples as illustrations of this procedure:

> "[I]f the State excluded an accountant from the jury solely because of the State's belief that accountants tend to be politically liberal and sympathetic to individuals, and it was demonstrated that there was no basis for this assumption about accountants, then the trial court might conclude that the State's explanation was pretextual. Similarly, if the accountant in the above scenario were excused, and the evidence during *voir dire* clearly demonstrated that the accountant-venireperson did not share the traits of liberalism and sympathy toward individuals, the trial court again might find that the State's explanation was pretextual." *Harris*, 129 Ill. 2d at 178.

No showing was made here that a basis did not exist for the prosecutor's suggestion that social workers have liberal traits. The trial court apparently found this assertion reasonable, and we do not disagree. Moreover, the evidence during *voir dire* does not clearly demonstrate that Jones would not possess liberal traits shared by social workers. In fact, the record suggests otherwise. During *voir dire*, Jones seemed particularly interested in the three phases of a murder trial where the death penalty could be imposed, and concluded that it must be for "the extra measure for the safety of the accused." Also, when asked whether anything relating to his job at the Department of Children and Family Services would make him more or less in favor of the death penalty, Jones did not respond conclusively, as he replied, "I don't think so." Finally, the prosecutor noted that Jones had a "somewhat pained" facial expression during the discussion of the death penalty. While the prosecutor acknowledged that Jones gave the right answers to his questions, and that the facial expression might have just been a personality trait, Jones' responses and demeanor nonetheless reinforced the prosecutor's view that Jones would have liberal traits. Again, the trial court, in the best position to observe Jones' demeanor, did not disagree with the prosecutor, and we cannot say that its decision was against the manifest weight of the evidence.

Defendant's second contention concerning Jones is also without merit. Defendant argues that the prosecutor challenged Jones because his wife is a teacher, but a white juror was married to a teacher, and another white juror and one white alternate juror were in fact teachers. Defendant relies on *McDonald*, where this court held that a prosecutor's proffered explanations for peremptorily striking black veniremen are inadequate "in light of the [similar] characteristics of the white jurors

whom the prosecutor accepted." (*McDonald*, 125 Ill. 2d at 199.) While this is true, we noted earlier in the opinion that most jurors are challenged for a combination of traits. Here, the prosecutor did not rely solely on the fact that Jones' wife was a teacher. In fact, the prosecutor stated that Jones's wife's profession was a *minor* factor in striking Jones. The other jurors mentioned were not similarly situated with Jones.

Finally, defendant argues that a prosecutor's challenge to bar a black member of the venire from serving as an alternate juror further gives rise to the inference that the prosecutor's use of the peremptory challenge against Jones was motivated by racial considerations. Defendant notes that the prosecutor struck Powe, who was questioned for a seat as an alternate juror. Defendant cites *United States v. Grandison* (4th Cir. 1989), 885 F.2d 143, 148, for this argument.

In *Grandison*, the court determined that no racial discrimination took place during jury selection. In finding this, the court noted that the prosecution could have used peremptory strikes against two black jurors and three black alternate jurors, but chose not to do so. The court noted that the members of the venire questioned for seats as alternate jurors would have had important roles in the case. Defendant believes this supports his argument. We do not agree. The *Grandison* court's point was that two black members of the venire served on the jury, and three black alternate jurors served important roles, even though the government could have challenged them if they intended to racially discriminate. *Grandison*, in fact, supports the State's argument, for the prosecution here could have struck the two black members of the venire that did serve on the jury, but chose not to do so. *Grandison* does not support defendant's claim.

## ARNETTE POWE

Defendant finally argues that the prosecutor engaged in purposeful discrimination when he peremptorily challenged Arnette Powe, who was questioned for a seat as an alternate juror. When asked whether she would have any commitments or obligations that were so important that she could not continue to serve as a juror into the next week, Powe answered that she did. Powe explained that she worked in a dental office and was the only assistant to her employer, and that the office was only open on Tuesday and Thursday of each week. This was Powe's only job, and Powe's employer had told her to ask the court if she could be dismissed from jury service. However, Powe stated that her employer did not indicate that her job was in jeopardy if she had to serve as a juror, and Powe said that it would not create any kind of hardship on her personally if she could not work those days. Powe also stated that the fact that her employer asked her to request a dismissal from jury service would not cause her any problems in sitting and listening to the evidence at trial, and that she could put her employer's request out of her mind.

At the time Powe and the other venireperson were interviewed in the judge's chambers, the jury and the first alternate had been selected. The prosecutor and defense counsel had also indicated to the court which of the remaining venirepersons they knew they would peremptorily challenge. The court then struck those venirepersons. Defense counsel was at this time out of peremptory challenges. Powe and the other juror, a white woman, were then brought into the judge's chambers and questioned.

The prosecutor explained that he challenged Powe because she expressed a strong desire to go to work, and the prosecutor did not want her mind on work during

the trial. Also, the prosecutor explained that when the court informed Powe that the death penalty would be sought, Powe gave all the right answers, but "puckered up and made a sour face as if that was distasteful to her." After the prosecutor gave this explanation, defense counsel noted that Powe did not indicate that she had a strong desire to go to work, and that she said she could put it out of her head. Defense counsel did not deny that Powe made a sour face when informed of the possibility of the death penalty.

Defendant argues on appeal that the prosecutor misstated Powe's *voir dire* testimony, as she did not express a "strong desire to go to work." Instead, defendant argues, Powe minimized the intrusion that jury service would have. Defendant concludes that the prosecutor's misstatement or exaggeration of Powe's testimony severely undercuts his explanation and gives rise to the likelihood of pretext with respect to that explanation. Defendant cites *United States v. Alcantar* (9th Cir. 1990), 897 F.2d 436, for this argument. *Alcantar* does not stand for the proposition which defendant asserts. *Alcantar* held that where both legitimate and illegitimate reasons are given by the prosecution in peremptorily challenging jurors, the need for a timely and meaningful *Batson* hearing is especially strong. (*Alcantar*, 897 F.2d at 440.) The *Batson* hearing in *Alcantar* took place several years after trial, and the trial judge admitted not remembering the jury. In the instant case, defendant had a *Batson* hearing during jury selection. Moreover, although Powe later stated that her job situation would not affect her if she sat on the jury, she did first indicate to the court that she did have "commitments or obligations or engagements that [were] so important" that she could not continue to serve as a juror into the next week. Additionally, defendant ignores the prosecutor's assertion that Powe made a face when asked about the

death penalty, which appeared to the prosecutor to indicate her distaste for the death penalty. The fact that defense counsel did not dispute this, and the fact that the trial court was present to observe, and did not dispute this, leads us to conclude that the trial court did not err in finding no racial motivation on the prosecutor's part in dismissing Powe.

Also of note here is the fact that when Powe was questioned along with the white member of the venire, who was eventually chosen as the second alternate, only one spot remained. The white juror did not indicate she would have any problem sitting on the jury into the next week, or exhibit any distaste for the death penalty. Thus the prosecutor was left with the choice of Powe, whose employer asked her to be excused from the jury and who made a face, or the other juror, who did not pose any problems for the prosecution. The prosecutor chose to challenge Powe.

Defendant makes several other arguments that Powe's challenge was racially motivated, all of which are without merit. Defendant first argues that the fact that Powe was an alternate juror gives rise to an inference of racial motivation for the challenge. Defendant again cites *Grandison* which, as explained previously, does not stand for this proposition.

Defendant also argues, without authority, that the fact that the prosecutor excused Powe from serving as a *second* alternate presents an even stronger inference of purposeful discrimination (than apparently striking a juror or first alternate) due to the even more remote chance that that alternate would actually be called into service on the jury. Common sense dictates, however, that the more remote a chance a venireperson has of serving on the jury, the less likely the prosecution would exercise a racially motivated challenge to keep the person from deciding the case.

We conclude that the trial court did not err in finding the prosecutor's reasons for peremptorily challenging McGruder, Jones, and Powe to be valid and neutral. In concluding this, we are mindful of defendant's argument's concerning factors which may suggest racial discrimination. However, we also note that two black jurors did serve on the jury, and the State did not strike the three black venirepersons consecutively. (See Grandison, 885 F.2d at 148.) Moreover, defendant's contention concerning the percentage of black jurors on the petit jury is without merit. First, defense counsel withdrew his motion concerning the percentage of black venirepersons in the initial jury pool, apparently because he realized there was no merit to his argument. Also, while defendant notes that the percentage of blacks in St. Clair County is 27.5%, 14% of the petit jury and its alternates were black, while only 11.7% of the general voir dire was black. Thus, a higher percentage of black jurors actually served on the jury than were in the venire. Finally, the Batson court itself has noted that the final venire need not mirror the racial composition of the community. Batson, 476 U.S. at 85 & n.6, 90 L. Ed. 2d at 80 & n.6, 106 S. Ct. at 1717 & n.6.

## II

Defendant's second argument on appeal is that he was denied his right under the fourth and fourteenth amendments to be free from seizure without probable cause to arrest. Defendant argues that police interrogation, which took place the day after the murders, amounted to custodial interrogation without probable cause, and as a result, his confession and evidence found at his residence must be suppressed. Alternatively, defendant argues, the trial court erred in denying his motion to suppress because, in doing so, it failed to recall the crux of his testimony, that he felt he was not

free to leave police custody. Defendant asks this court to reverse the matter and remand either for a new trial or for a new suppression hearing.

We agree with defendant that the trial court erred in failing to recall testimony crucial to his defense on his motion to suppress his confession. However, while we find this error, we also find the evidence of defendant's guilt, even without his confession to the police, so overwhelming that any error in admitting the confession at trial was harmless. We also find that the trial court's decision concerning the physical evidence found in defendant's basement was not affected by its error concerning the confession.

## DEFENDANT'S MOTION TO SUPPRESS

Defendant filed motions to suppress statements and evidence on October 3, 1989. In his motions, defendant alleged, *inter alia*, that his detention, arrest and seizure were without probable cause, without a warrant, and without proper consent. Defendant further argued that physical evidence and witnesses were the "direct and indirect fruits of the illegal arrest and detention," and asked that this evidence be suppressed.

The hearing on defendant's motion to suppress was held on November 21, 1989, at which the following evidence was presented. David and Dawn were murdered on July 4, 1989, around 10:15 p.m. The following morning, the police department's major case squad was investigating leads. One of these leads was a car seen in the mobile home park at the time the murders occurred. Officers Phillip Delaney and Richard Siekmann arrived at defendant's residence in Washington Park, Illinois, at 5:15 a.m. on July 5, 1989, to investigate the car, which was traced to defendant's sister. After talking to defendant's mother and sister and learning that defendant had

used the car the previous night, the officers asked to speak to defendant.

Defendant was awakened and spoke to the officers, who asked defendant to accompany them to the Washington Park police station to make a statement. Defendant testified that he took a few steps towards the police car, but stopped and told the officers he wanted to go back in the house and put on some warmer clothes. According to defendant, one of the officers then put his hand on defendant's shoulder and refused to let him go back in his house. This officer told defendant that he would only be gone for a few minutes. Defendant then testified that the officers "drag[ged]" him into the car. By this, defendant meant that one of the officers walked in front of him, and one walked behind him as they walked to the car. Defendant also testified that when he and the officers arrived at the Washington Park police department, and went into a questioning room, one of the officers "[p]ut [him] down" and said, "We [are] not going to let you go until we get what we want out of you."

The officers denied threatening defendant. The officers also testified that defendant, after interrogation at the Washington Park station, agreed to accompany them to the St. Clair County jail for further questioning and to take a polygraph examination. The officers did not think defendant committed the murders, but thought that he might have known what happened. The officers also testified that defendant was not a suspect until after he confessed, and was free to leave at any time before his confession. Defendant testified that he went with the officers to the St. Clair County jail because he knew that he did nothing and because he did not know what was going on.

Once at the St. Clair County jail, defendant was brought to a large open room. Defendant testified that

the officers would not let him leave that room. After talking to the two officers, defendant took a polygraph exam. The polygraph examiner testified that once he informed defendant that he was not telling the truth, defendant confessed to the murders.

Concerning the physical evidence, Officer Freddie Larnell testified that police received information from a "subject" that items could be found in a specific place in defendant's basement. The officers went to defendant's house, received permission to search the basement from defendant's father, and found martial arts equipment, including a bloodied knife, a black outfit, and a pair of thongs.

The court then heard arguments. Defense counsel argued that defendant was not free to leave the police interrogation, and noted that defendant had attempted to go back into his house to put on warmer clothes, but the officers refused. The trial court denied defendant's motions, and stated: "There was no testimony that I recall that said the defendant at any time said he felt he could not leave, or that he was asked—or that he asked whether he could leave and was denied that permission." The court also found that the search of defendant's house which produced the martial arts equipment had been performed with defendant's father's permission.

## EVIDENCE PRESENTED AT TRIAL

Defendant's trial began on March 20, 1990. Testifying first was Francine Lieneke, David and Dawn's grandmother. David and Dawn lived with Lieneke, and their grandfather, on 3400 Velda Drive, in the Symonds Mobile Home Park. On July 4, 1989, Lieneke and her husband, the victims' grandfather, went to play bingo. David and Dawn remained at the trailer. Leineke called home at approximately 8:30 p.m. to check on the children. At this time, everything appeared to be normal.

Lieneke and her husband played bingo until 10:20 p.m., and then returned home and found the children dead. Dawn had the telephone in her hand.

Lieneke also testified that David had a friend, Viroon Williams, who lived with them a few days at a time. The last time Lieneke saw Williams was two or three days before July 4, when Williams was going camping with friends.

Next to testify was Douglas Crouch. On July 4, 1989, Crouch was visiting his mother, who lived at 3501 Velda Drive in the Symonds Mobile Home Park. Between the hours of 9 and 10 p.m. on July 4, Crouch noticed a car drive through the mobile park. Crouch recognized the car and knew its license number because a few weeks earlier, a young white man, whom he later learned was Michael Boyer, had driven the car through the mobile home park with a red blinking light on top of the car. Crouch stopped the car and asked the young man what he was doing, and the young man replied that he was a member of a police department. Crouch did not believe the man, and informed the Belleville police department of the make, color, and license plate number of the car. The car was a 1978 or 1979 Chevrolet Caprice or Impala, and was a greenish-blue color. The car's license plate number was AR 4426.

On July 4, when Crouch saw the car, there were two black males inside. On that date, the car circled around at a slow pace, and came back 15 minutes later going in the other direction. Crouch informed the police of this information late on July 4 or early in the morning of July 5.

George Simpson, who lived near the mobile home park, also saw defendant's car on the night of July 4, 1989. Simpson testified he was returning home around 10:15 p.m. and noticed a 1975 or 1976, light-green Chevrolet, parked on the wrong side of the road. Simp-

son turned on his bright lights, and someone in the car "ducked down."

Testifying next was Sandra Bylo, Dawn's best friend and her neighbor. Bylo was at the Lieneke's until about 9:30 p.m. on July 4, 1989. Glen Kirk, Bylo's grandfather, testified that he received a telephone call around 10:15 p.m. on July 4, 1989. There was no one on the line, and Kirk could only hear music or a television in the background.

Also testifying was Viroon Williams, David's friend who lived with the Lienekes at various times. Williams and defendant were also friends, and they practiced martial arts together. The two knew "the basic kicks, punch [sic], how to break bones." Williams also knew Maurice Douglas, who sometimes practiced martial arts with Williams and defendant.

According to Williams, defendant possessed martial arts equipment, including "[s]words, [a] Ninja suit, stars, darts, bow and arrows." The Ninja suit consisted of a black outfit with a hood, and "two-toe boots." In February or March 1989, Williams went over to defendant's house. When defendant went to the store, Williams went to the basement and took a sword and suitcase in which defendant kept his martial arts equipment, and hid them in defendant's back yard in a ditch. Williams later took this equipment to Lenny Boyer's house. A few weeks later, Lenny Boyer told Williams that defendant had retrieved the martial arts equipment. Williams denied ever taking a VCR or Nintendo game from defendant.

Just before the murders, Williams went camping with friends, but returned early because of rain. Williams did not stay with the Lienekes after he returned, but instead stayed with other friends. On the night of the murders, Williams was at the Veiled Prophet Fair in St. Louis until about midnight with his girlfriend, her parents and brothers and sisters, and a few other friends.

On July 5, 1989, Williams learned that the police were looking for him. Williams telephoned the police and made arrangements to meet them. At this time Williams learned of the murders.

Also testifying was James Boyer, known as Michael Boyer (Michael). Michael and defendant were friends, and in 1988, Michael moved in with defendant's mother when defendant was in Texas. Michael also knew David and Dawn. Michael, his brother Lenny, David, and Williams often danced together at a local nightspot.

Michael testified that he once took defendant up to the Lieneke's home at the mobile home park to show defendant where Williams lived. Defendant was looking for Williams to retrieve a VCR, Nintendo game, and radio defendant believed Williams had stolen from his family. Michael brought defendant up to the Lieneke's trailer, knocked on the door, and introduced defendant to, David. Williams was not at the Lieneke's home that day.

On July 4, 1989, Michael was home with his father, and later went to the Midway fire department in Centreville, where a barbecue was being held. Defendant came to the firehouse and asked Michael if he wanted to go for a ride to look for Williams. Defendant had the green Caprice. Michael did not go with defendant, but instead went back to his house with his father and brother.

Michael also knew Williams, and testified that Williams once brought a brown suitcase, a sword, and two-toed shoes to his house. Defendant later retrieved these items from the Boyer's house around July 1 or 2, 1989. Michael also testified that near the end of February or beginning of March 1989, he saw defendant receive a package from the United Parcel Service which contained a knife defendant's brother had sent him. This knife was the knife later retrieved from defendant's basement.

On July 5, 1989, the police came to the Boyer's house and asked where Williams could be found. They also asked about defendant, and Michael told them that he had talked to defendant the previous night.

Michael's brother, Lenny Boyer, Jr., also testified. Lenny was friends with defendant, David, and Dawn, and had stayed overnight at the Lieneke's home on various occasions. Lenny testified that Williams once brought a brown suitcase to his house. The suitcase contained a "Ninja suit, [throwing] stars and darts." Williams also brought over a sword and two-toed Ninja shoes that day. Defendant later retrieved these items from Lenny.

On July 4, 1989, Lenny was sleeping at home when defendant entered his house and came into his room. Defendant was looking for Michael and Williams. Lenny told defendant that Michael was at the firehouse, but that he did not know where Williams was. Lenny got up and went to the firehouse. Defendant followed Lenny to the firehouse and talked to Michael there. Lenny then went on an errand, and got back home around 8:30 or 9 p.m., where he remained the rest of the evening. Lenny's father and Michael came home around 10 p.m.

Maurice Douglas testified next. Douglas had known defendant since Douglas was five years old, and the two were friends. Douglas practiced martial arts with defendant and Williams, but did not know David and Dawn.

On July 4, 1989, Douglas returned home from work around 8:15 p.m. Defendant called Douglas on the phone about this time and came over around 8:30 p.m. in his "large sized Chevy, 1980 Chevy." The two went out to Frank Holten State Park, where defendant told Douglas he was having trouble with Williams. According to Douglas, defendant said he wanted to kill Williams because Williams had stolen a VCR, radio and a Nintendo set

from defendant's family. After about 10 minutes, the two headed up Highway 161 towards the mobile home park. The two then stopped at a gas station because defendant wanted Douglas to call Lenny and ask him about the stolen items. Douglas called the Boyer's residence, but someone named "Mel" told Douglas that Lenny was not home. Defendant then suggested that the two drive around the mobile home park to "wait on them." The two drove around the park four times "looking for the home."

After driving around the mobile home park, defendant parked his car and claimed something fell off the back of the car. Defendant then asked Douglas for a screwdriver from underneath the seat, and went to the back of the car and popped open the trunk. After closing the trunk, defendant came back to the front of the car and asked Douglas if he "[saw] anything on him." Douglas told defendant that he could not see anything on him. Douglas believed that defendant might have had enough time to change shoes after he got out of the car. After this, defendant told Douglas that he would be right back, and that he had to get some things from a friend. Douglas switched to the driver's seat. Defendant came back about 10 minutes later, jumped in the car very quickly, and told Douglas that he had just killed two people. Douglas told defendant that he did not believe him. Defendant, not quite "hollering," told Douglas to start the car.

When defendant got back into the car, Douglas could not see what defendant had in his hand because defendant shoved something up under the seat very quickly. It was also very dark outside. Defendant told Douglas to drive to Frank Holten State Park, which Douglas did. Once there, defendant pulled out a knife from under the car seat. The knife had blood and skin all over it. Defendant told Douglas that he kept the blood on the

knife because his "teacher told him that the blood was sacred, [and that he] should keep the blood on the knife overnight." Defendant then told Douglas that if he told anyone, defendant would "get" Douglas and his family. Douglas understood this to be a threat, and was very nervous. Defendant also told Douglas that he killed a man and a woman. Douglas identified the knife found in defendant's basement as the knife defendant showed him in the car. The two then went to defendant's house, where Douglas called his father. The time then was about 10:30 p.m.

Douglas also testified that defendant had previously shown him where he kept his martial arts equipment. Defendant kept this equipment in either the basement or the trunk of his car. Douglas did not testify that he told the police where to find these items.

Douglas then testified about his role in the investigation. On July 5, 1989, while defendant was being questioned at the St. Clair County Building, Officer David Hoffman questioned Douglas. Douglas told Hoffman only that he and defendant were at the mobile home park the previous night and were looking for someone named Mike, and that while the two were at the park, defendant got out of the car to fix something that fell off the car.

While Hoffman was questioning Douglas, Hoffman informed Douglas that defendant had just confessed to the murders. Douglas then added the fact that defendant might have been acting a little funny when he got back in the car after being gone for about 10 minutes. However, Douglas did not incriminate defendant in the murders because he was afraid of defendant's threat, and also because he did not want to see defendant go to jail. Later that night, after talking with his father and brothers, Douglas received the encouragement he needed to tell the police all he knew about the murders. Douglas'

father immediately called the police and left a message for Officer Hoffman to contact him. The next day, Douglas told the police what he really knew about the murders, and took the police to the spot he and defendant had driven and parked the night of July 4, 1989.

On cross-examination, Douglas testified that he did not know the Boyers very well and often confuses Michael's and Lenny's names. Douglas also stated that on the night of July 4, 1989, he called the Boyers looking for Michael, not Lenny.

Officer David Hoffman, a member of the Swansea police department, testified that he interrogated Douglas, who at first did not reveal all the information he knew about the murders. However, on July 6, 1989, Hoffman received a call from Douglas' father informing him that Douglas did have information concerning the murders and that he wished to talk to the officer. Douglas' parents, who were very concerned and cooperative, brought him to the police station, where he informed Hoffman what he knew about the murders.

Detective Freddie Larnell, a member of the Alton police department, testified that on July 6, 1989, he searched defendant's basement and found a vinyl suitcase and a sword in a cardboard box in a crawl space. The suitcase held two pieces of black clothing, a survival knife, and a pair of "thong-like" shoes.

Steven Nonn, a deputy sheriff with the Madison County sheriff's office, testified that on July 6, 1989, he met with Simpson, who showed him where he saw the car defendant drove in the mobile park home on July 4. Nonn found a unique set of footprints in soft mud along the area where the car had been parked. The police photographed, measured, and made plaster casts of the prints.

Mark Johnsey, a crime scene technician with the Illinois State Police, testified that he searched defendant's

sister's car and found a throwing star in the trunk. Johnsey also testified that he went to the defendant's residence, opened the suitcase that had been found, and saw a large hunting knife in a sheath, like a survival knife, that had a large amount of what appeared to be blood on the blade.

Next to testify was Dr. Harry Parks, the pathologist who performed the autopsies on David and Dawn. David and Dawn both had seven knife wounds which caused their death. Dr. Parks believed that the knife found in defendant's residence was of a type which could have caused the wounds to the victims.

Michael Brown, an employee at the Metro East Forensic Science Laboratory, testified that he took the items found at defendant's residence which had blood on them and compared the blood found on the items to samples of David's and Dawn's blood. Brown testified that the blood found on the knife was consistent with that of a mixture of David's and Dawn's blood. Blood found on the set of pants was consistent with that of Dawn's blood. There was also blood found on the two-toed shoes, but the sample was not large enough to test.

Thomas Gamboe, Jr., a forensic scientist with the Metro East Forensic Science Laboratory, testified that he was able to positively identify the right two-toed shoe found in defendant's basement as the shoe which created one of the prints found in the mobile park. Gamboe also stated that while he was not able to positively identify the left two-toed shoe found in defendant's basement as the shoe that made the prints at the mobile home park, the left shoe was similar to the left print found at the mobile park.

Richard Siekmann, a deputy sheriff with the St. Clair County sheriff's department, testified that he traced the license plate on the car seen at the mobile home park to defendant's sister. It was Siekmann, along with Officer

Phillip Delaney, who interviewed defendant and took his written confession. Defendant told Siekmann that he had gone to the mobile home park to kill Williams and David because Williams had tried to run him over in his car two weeks prior to the murders. David was in the car Viroon drove. Defendant then told Siekmann that he went into the trailer home, saw David and stabbed him, heard a girl scream what he thought was his nickname, and then stabbed Dawn. On defendant's way out of the trailor home, he stabbed David again.

Robert Baldwin, a sheriff with the St. Clair County sheriff's department, administered the polygraph examination to defendant. The jury was not informed that Baldwin conducted polygraph exams, or that defendant took a polygraph test. Baldwin testified that he questioned defendant and told him that he was not telling the truth. When Baldwin told defendant that Baldwin believed the person in the car with defendant the night of July 4, 1989, committed the crimes, defendant confessed that he killed David and Dawn.

Phillip Delaney, the director of the Victim Information Program of St. Clair County and a member of the major case squad, testified next. Delaney read defendant's written confession into the record over objection by defense counsel. The confession contained the same information as Seikmann's recounting of defendant's oral confession.

Testifying for defendant was his mother, Irene Mitchell. Mitchell testified that on July 4, 1989, defendant was playing in the park with his dog and came home to eat around 7 p.m. Then, according to Mitchell, defendant went down to a grocery store and returned at 7:30 p.m. After this, defendant received telephone calls from Michael and then Douglas. Mitchell testified that Michael told defendant to pick him up in Belleville because he was scared. Defendant left his house a little after 8 p.m.,

taking his sister's car, and returned around 10:30 p.m. with Douglas. Mitchell then identified the clothes defendant wore on the night of the murder. (There was no trace of blood on the clothes.) Mitchell also testified that defendant did not act funny when he returned at 10:30 p.m.

Mitchell then testified that she went to Douglas' house "the day after [July] 6th" and Douglas told her that "they [were] trying to get me and Peter [defendant] because we [were] around that area." Mitchell stated that Douglas seemed scared because someone was trying to get him, and that Douglas told her that he and defendant went up to Belleville to find Michael. The two could not find Michael, and Douglas called the Boyer's residence. According to Mitchell, Douglas told her that Mr. Boyer told him that Michael was not there. The two then drove around the trailer park a few times, but could not find Michael, and thus left.

On cross-examination, Mitchell stated at first that she never told the police about the telephone call defendant received from Michael on the evening of July 4, 1989. Mitchell later retracted this and said that she did tell an officer about Michael's telephone call, but she did not know which officer she told, and that the officer did not take down the statement. Mitchell also testified that defendant did not own knives and swords, did not practice martial arts, and did not own a black outfit.

Next to testify was Heidi Montmini, a clerk at the Royal Heights One Stop in Belleville. Montmini knew David and Dawn, and testified that David got into a fight with someone at the One Stop a few weeks prior to July 4, 1989.

After a few character witnesses, defendant took the stand and testified that he spent July 4, 1989, at the park playing with his dog. Defendant left the park and went home around 7:30 p.m. to eat, after which he re-

ceived a telephone call from Michael, who asked defendant to pick him up in Belleville because he was in trouble. After this, Douglas called defendant on the phone and the two decided to go to Belleville to try and find Michael. The two left around 8:15 or 8:30 p.m., and after riding around in a park, drove up to Belleville. The two looked for Michael where he told them he would be, either at a McDonald's restaurant or at the mobile home park, but could not find him.

Defendant further testified that the two drove around the mobile home park trying to find the address Michael gave him. When defendant found the address, he parked his car by a fence, told Douglas to stay in the car, and went up to the trailer and knocked on the door. There was no answer. Defendant testified that he never entered the trailer, never saw Michael or anyone else around the trailer, and that no one answered the door. Defendant then got back in the car and told Douglas, "Let's go." Defendant testified that he never had a weapon with him, and never put on any other clothes that night.

Defendant was then shown the knife which was taken from his basement, and stated that he had seen Williams with the knife, as well as two swords, a few weeks before the two got in a little argument. Defendant testified that he never had a knife on July 4, 1989, and that the only knife he ever owned was a small pocket knife. Defendant looked at the Ninja outfit and testified that he never had such a suit, but that Williams had something like it. Defendant admitted using a screwdriver to fix his license plate when he parked at the mobile home park, and said he threw the screwdriver in the front of the car by his feet when he got done using it. Defendant denied showing Douglas a knife on the night of July 4, 1989, or ever telling Douglas he had killed two people.

Defendant also testified that after failing to find Michael, he and Douglas left the mobile home park and went to defendant's house, where Douglas called his father. Defendant talked to Douglas' father and asked him what time he wanted Douglas home. The two then went to a bakery, ate, and then to Douglas' cousin's house. Douglas' cousin was not home and defendant then took Douglas home. Defendant talked to Douglas' father, who was upset that Douglas got home so late.

The next morning, around 4:45 a.m., defendant was told the police were at his house and wished to talk to him. Defendant denied admitting he killed David and Dawn, and stated that the officers made him sign the confession by raising their voices.

On cross-examination, defendant admitted that Michael had previously taken him to the mobile home park and shown him where David lived. At that time, defendant was looking for Williams, who he thought had taken some of his family's possessions. Defendant stated that he did not remember meeting David that day. Defendant further admitted being at the Leineke's trailer around 10 p.m. on July 4, 1989, but could not really say if it was around 10:15 p.m. Defendant denied that he had gone to the Midway fire department on July 4, 1989, and met Michael there. Defendant also denied receiving a knife from his brother.

Upon further cross-examination, defendant admitted that he was in fact looking for Williams at the mobile home park on the night of July 4, 1989, and that he wanted to retrieve the items Williams allegedly took from him. Defense counsel, realizing what defendant had just admitted, asked him on redirect examination if he had just admitted to the jury that he was looking for Williams that night at the trailer park. Defendant stated again that he was looking for Williams, thus contradicting his earlier story that he was looking for Michael.

The State called Michael in rebuttal, who testified that he never called defendant on July 4, 1989. The only time Boyer saw defendant that day was at approximately 7:30 p.m. at the Midway firehouse. From the firehouse, Michael went home, where he remained with his father, his brother, and another firefighter.

The State also called Leonard Boyer, Sr., the father of Michael and Lenny, in rebuttal. Leonard Sr. testified that both Michael and Lenny were home with him from about 8:20 until 11:00 p.m. on July 4, 1989, at which time Leonard left to work at the firehouse. Leonard also testified that he never received a telephone call from Douglas that evening.

Also testifying at rebuttal was Willie Douglas, Douglas' father. Willie testified that Irene Mitchell did not have a conversation with his son on July 6, 1989. Instead, Mitchell talked to his son on July 8, 1989. Willie did not want Mitchell talking to his son alone, so he remained during their conversation. Willie told his son to tell Mitchell only what he had told the police on July 5, but not what Douglas told the police later on July 6. Douglas thus did not tell Mitchell about defendant's role in the murders. Mitchell was very upset, and Willie did not want to upset her any more. Willie then stated that Mitchell told Douglas to change the amount of time defendant was gone from the car, and to not say he was gone for 10 minutes.

Willie also testified that on the night of July 5, 1989, Douglas seemed as if he had more to say about what happened the night before. Douglas discussed the situation with his brother, and then told his family the truth about what happened the night before. Willie immediately contacted the police.

Finally, the State called Jerry Bridger and Mark Murphy, who both testified that Williams was with them at the Veiled Prophet Fair in St. Louis on the night of the

murders. These two testified that they and Williams did not return from the fair until 11 or 11:30 p.m.

## ANALYSIS

We first address defendant's claim that the trial court erred in failing to recall and consider the crux of his defense at his motion to suppress, his testimony that he was not free to leave police custody. Defendant is correct in this assertion, as the trial court clearly failed to recall that defendant testified the officers: (1) refused to let him go back into his house to get warmer clothing; (2) told him he could not leave the Washington Park police department until they got what they wanted; and (3) would not let him leave the St. Clair County Building. We find the trial court's failure to recall defendant's testimony a violation of defendant's due process rights and error.

Defendant argued at the suppression hearing that he had been illegally seized in violation of the fourth and fourteenth amendments because the police had no probable cause to arrest him and because he was not free to leave the police's questioning. In *People v. Holveck* (1990), 141 Ill. 2d 84, this court stated:

> "To determine whether an arrest has occurred, courts have considered a number of factors: whether a reasonable person, innocent of any crime, would have considered himself arrested or free to leave (*Michigan v. Chesternut* (1988), 486 U.S. 567, 573, 100 L. Ed. 2d 565, 571-72, 108 S. Ct. 1975, 1979; see also *Dunaway v. New York* (1979), 442 U.S. 200, 208 n.6, 60 L. Ed. 2d 824, 832 n.6, 99 S. Ct. 2248, 2253 n.6; *People v. Lucas* (1989), 132 Ill. 2d 399, 417-18; *People v. Reynolds* (1983), 94 Ill. 2d 160, 165); '[t]he intent of the officer and the understanding of the arrestee' (*People v. Sanders* (1981), 103 Ill. App. 3d 700, 709); and whether the defendant was told he was free to leave or that he was under arrest (*People*

*v. Townes* (1981), 94 Ill. App. 3d 850, 853)." (*Holveck*, 141 Ill. 2d at 95.)

Defendant's testimony, which the trial court failed to recall and consider, involves all three of these factors. If defendant's testimony is true, a reasonable person would have believed he was not free to leave. Moreover, the intent of the officers, and defendant's understanding of such, would clearly have been to not allow defendant to leave. Finally, defendant would have been specifically told he was not free to leave. Thus, if recalled, considered, and believed by the trial court, defendant's testimony would have indicated that he was not free to leave. Defendant would thus have been illegally seized because the officers had no probable cause to arrest. The officers admitted that defendant was not even a suspect until after his confession. The State concedes that if defendant was illegally seized, his confession should have been suppressed.

In *People v. Bowie* (1976), 36 Ill. App. 3d 177, the defendant was charged with battery, resisting arrest and criminal trespass. In his closing argument, defense counsel noted a conflict of evidence regarding who struck whom first, the officer or defendant, and further noted defendant's testimony that he bled from an injury to his head. The trial court interrupted defense counsel and stated there was no such testimony, and struck the argument from the record. However, defendant, in his testimony, stated that the officer hit him in the head and that blood started rushing down.

The *Bowie* court noted that a trial judge sitting as a trier of fact is limited to the record before him, and that a denial of due process of law results when a court considers matters outside the record. The court then concluded that a trial judge must similarly consider all the evidence presented in determining the matter before it. (*Bowie*, 36 Ill. App. 3d at 180.) In *Bowie*, where the trial

court failed to remember and consider testimony that was the crux of the defense, the defendant did not receive a fair trial. (See also *People v. Morgan* (1976), 44 Ill. App. 3d 730.) The same is true here. The trial court's failure to recall and consider testimony crucial to defendant's defense resulted in a denial of defendant's due process rights.

The State, while admitting that the trial court's memory "might not have been entirely accurate," argues that defendant's due process rights were not violated. The State first argues that the trial court did not base its findings solely on the absence of such testimony. Instead, the State notes, the trial court denied defendant's motion "[u]nder all of the circumstances." However, the trial court clearly did not base its decision on all of the circumstances, as it failed to recall the testimony most crucial to defendant's argument.

The State also argues that defendant's testimony is irrelevant because the judge did not accept defendant and his mother as credible witnesses. This argument is without merit, as the trial court never even mentioned defendant's mother in making its ruling, nor did it ever state that defendant was not a credible witness. The State's argument rests upon the fact that the court found against defendant. However, while the court found against defendant, it also failed to recall the crux of defendant's testimony in doing so.

The State also believes that the trial court's failure to recall defendant's testimony was understandable because defendant stated he went to the St. Clair County Building with the officers because he knew he did not do anything. However, if the court had found that defendant's explanation for accompanying the officers to the St. Clair County Building revealed that defendant believed he was free to leave, the court should have stated such instead of incorrectly finding no testimony whatsoever

that defendant felt he was not free to leave. The court perhaps did not make the finding the State suggests because while defendant testified he went to the St. Clair County Building because he knew he did not do anything, he also testified at the same time that he did not know what was going on.

The State finally argues that defendant has waived for review the trial court's failure to recall testimony because defense counsel failed to bring the inaccuracy to the court's attention. The State relies on *People ex rel. Reynolds v. Myers* (1978), 58 Ill. App. 3d 373, where the defendant appealed a decision of paternity. The defendant in *Myers* argued that the trial court erred because it did not recall the correct number of persons involved in a sexual incident. The appellate court found that the trial court did not fail to recall the evidence, but was only confused as to the number of participants involved in the incident. The court also noted that the trial court correctly recalled the *pertinent* details of each witness' testimony. The appellate court then held that "[u]nder these circumstances, and in light of defense counsel's failure to correct the court's possible misapprehension of the number of persons involved, any error that may have been committed cannot warrant a reversal." (*Myers*, 58 Ill. App. 3d at 377.) Thus, the *Myers* court found defense counsel's failure to correct the court's possible misapprehension of a nonpertinent detail a factor in finding no reversible error.

As defendant correctly notes, this court has held that a defendant need not interrupt a trial court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 266.) In *Saldivar*, defendant argued to the court that it could not consider a material element of the offense in sentencing, but the court stated it considered the element in announcing sentence. On ap-

peal, the State argued that defendant had waived the issue for failing to interrupt the trial court during sentencing and reminding the court of such. This court held in *Saldivar* that defense counsel need not interrupt the trial court during pronouncement of sentence to remind it of something that he had just argued to the court.

Here, defense counsel argued in his closing argument on the motion to suppress that the evidence showed that defendant was not free to leave. In fact, this was one of defendant's main arguments in favor of suppressing his confession. Defense counsel even noted specifically that defendant testified he attempted to return to his house and put on warmer clothes, but that the officers refused to let him do so. While *Saldivar* involved a trial court's explaining a defendant's sentence, we find the same rule to apply to a trial court's explaining its reasons for not suppressing evidence. We thus do not believe under these circumstances that defendant has waived this issue for review. See also *People v. Martin* (1988), 119 Ill. 2d 453, 459-60.

The State also argues that defendant failed to preserve the issue for review because he did not include the specific issue in a post-trial motion. (*Enoch*, 122 Ill. 2d at 186-88.) Defendant's post-trial motion contained only the general objection that the trial court erred in failing to suppress the evidence. As we noted earlier, however, a claim of waiver is not well-taken in a capital case where defendant has raised the point at trial but failed to include the specific issue in a post-trial motion, and where the defendant may raise the issue as a deprivation of a constitutional right in a post-conviction hearing. The trial court's failure to recall crucial evidence is of the type of constitutional error which may be later raised in a post-conviction hearing, and we thus do not find the matter waived.

We therefore find that the trial court committed error when it failed to recall the crux of defendant's testimony concerning whether he was free to leave police custody. However, while defendant argues that the cause should be remanded either for a new suppression hearing or a new trial, we disagree. Even assuming that the trial court on remand would find an illegal seizure and suppress defendant's confession, we find that the other evidence of defendant's guilt introduced at trial is so overwhelming as to make the introduction of defendant's confession harmless error.

In finding this, we note that introduction of the physical evidence found in defendant's basement was not affected by the trial court's error. Defendant argues, however, that the physical evidence must be suppressed as fruit of the poisonous tree. Defendant asserts that the police would not have known where to find the martial arts equipment had he not been illegally detained and told the police that Douglas was with him on the night of the murders. Defendant then argues that Douglas informed the police where the items could be found.

Under a poisonous tree analysis, the defendant bears the initial burden of showing a connection between the primary illegality and the discovery of allegedly tainted evidence. (*People v. Gervasi* (1982), 89 Ill. 2d 522, 532.) Defendant attempts to show this connection by arguing that questioning Douglas was a product of the confession, and that Douglas informed the police where they could find defendant's martial arts equipment. As in *Gervasi*, however, defendant cannot make this connection except by conjecture, as there is no evidence in the record that Douglas informed the police where defendant kept the martial arts equipment. The only evidence in the record concerning how the police knew the location of the Ninja equipment was a statement by Officer Larnell at the suppression hearing that a "subject" had

informed police where to find the items. Nothing in the record identifies this "subject." Nor was there any attempt by defense counsel at the suppression hearing to show that Douglas informed the police where defendant's martial arts equipment was located.

Defendant believes that Douglas was the one who informed the police where they could find defendant's martial arts equipment because he talked to the police on July 5 and 6. However, while Douglas did testify at trial that defendant had shown him where he "usually" kept the equipment, "in his basement or his trunk of his car," he did not testify that defendant kept these items in the crawlspace behind paneling in the basement. More significantly, Douglas never testified that he informed the police where the items could be found. Moreover, other people who knew defendant were interviewed at that time as well, including Williams, who testified that he once went into defendant's basement and took the Ninja equipment. Williams, who practiced martial arts with defendant, thus also knew where defendant kept his martial arts equipment. There is simply no indication in the record that Douglas informed the police where the equipment was located. Defendant is thus unable to meet the initial burden of showing a connection between his detention and the police's finding his martial arts equipment.

## HARMLESS ERROR ANALYSIS

The United States Supreme Court in *Arizona v. Fulminante* (1991), 499 U.S. 279, 113 L. Ed. 2d 302, 111 S. Ct. 1246, held that the harmless error rule may be applied to an involuntary confession obtained in violation of the fifth amendment. (*Fulminante*, 499 U.S. at 310-12, 113 L. Ed. 2d at 331-33, 111 S. Ct. at 1265-66 (plurality opinion).) In its discussion, the Court noted other constitutional violations that may also be subject to

the harmless error analysis, including violations of the fourth amendment. (*Fulminante*, 499 U.S. at 306-07, 113 L. Ed. 2d at 329-30, 111 S. Ct. at 1263 (plurality opinion); see *Chambers v. Maroney* (1970), 399 U.S. 42, 52-53, 26 L. Ed. 2d 419, 429, 90 S. Ct. 1975, 1981-82.) Assuming that on remand the trial court would find a violation, the alleged violation would involve a confession obtained during an illegal seizure in violation of the fourth amendment. We thus find that the admission of defendant's confession, if improper, is subject to the harmless error rule.

It is undisputed that defendant was at the scene of the murders at the time the murders occurred. Both defendant and Douglas admitted being at the trailer park around 10 p.m. the night of July 4, 1989. Defendant also admitted leaving his car and going up to the Leineke trailer and knocking on the door. Defendant further admitted that he knew Williams stayed at the Leineke's trailer, and that on the night of the murders he was looking for Williams to retrieve some items he believed Williams stole from his family.

Moreover, Douglas testified that defendant went to the trunk of the car, popped it open, came back around front, asked Douglas if he saw anything on him, and then went to one of the mobile homes. After being gone for about 10 minutes, defendant came back to the car, threw something under the seat, and told Douglas that he had just killed two people, a man and a woman. Defendant later pulled out a knife from under the car seat and showed Douglas. The knife had blood and skin on it. The admission of defendant's confession to the police is thus particularly harmless because defendant also confessed to Douglas.

The physical evidence found in defendant's basement also shows that defendant committed the murders. The knife, which Douglas identified as the knife defendant

showed him the night of the murders, contained blood consistent with samples of blood taken from David and Dawn. The knife was also consistent with the type of wounds inflicted on the victims. The black Ninja pants contained blood consistent with that of Dawn's. Finally, one of the two-toed shoes, which also contained blood, was identified as having produced a print in the mud where defendant had parked his car at the mobile home park the night of July 4, 1989. The other two-toed shoe was found to be similar to another print found in the mud. Further, Williams, Michael, and Lenny all testified that defendant owned the martial arts equipment, and that defendant had retrieved it from Lenny, and thus had it in his possession a few days before the murders.

While defendant testified that Williams owned the martial arts equipment, thus inferring that Williams may have committed the murders, Williams, Bridger, and Murphy all testified that Williams was at the Veiled Prophet Fair in St. Louis at the time of the murders. Defendant offered no evidence to dispute this. Also, while there was no blood on the clothes defendant wore on the night of the murders, there was blood on the black Ninja pants and the two-toed shoes, which the State represented were put on by defendant before he committed the murders. And while defendant testified that Michael called him and told him that he was in Belleville at either a restaurant or the trailer park, defendant admitted on cross-examination that he in fact went up to the park to find Williams to retrieve items allegedly stolen from defendant. Moreover, Lenny, Michael, and their father all testified that the three were at home the night of July 4, 1989, when the murders occurred. Michael also testified that he never phoned defendant the night of the murders.

The evidence against defendant is thus so overwhelming that any error in admitting at trial defendant's confession to the authorities is harmless.

## III

Defendant's third argument is that his confession to the police was involuntary and in violation of his fifth amendment rights. We need not address this issue, however, as we have already decided that the trial court's decision at the suppression hearing concerning defendant's confession was in error and that the harmless error rule applies.

## IV

Defendant's fourth argument is that the suppression hearing was tainted because the State elicited information concerning defendant failing a lie detector test. Again, we need not address this issue as we have found that the trial court's decision at the suppression hearing concerning his confession was in error, but that the harmless error rule applies. We further note that any such error does not affect the introduction of the physical evidence, as the trial court decided at the suppression hearing that the police had permission to conduct the search. Defendant also failed to argue at the suppression hearing that Douglas was the one who informed the police where the physical evidence could be found, and defendant cannot show that Douglas informed the police where the physical evidence was located.

## V

Defendant next argues that he was denied his right to a fair trial because the trial court admitted over his objection testimony from various witnesses that he behaved as a "Ninja," possessed "Ninja" weapons, and

possessed weapons unrelated to the offenses charged. We find this argument to be without merit.

Defendant filed a motion *in limine* prior to trial which asked the court to suppress any evidence concerning defendant's belief that he was a "Ninja," which defendant argued has a connotation of being a silent and ruthless killer. Defendant had no objection, however, to admitting the knife, the suit, and the two-toed shoes found in his basement. After hearing arguments on the matter, the trial court denied defendant's motion and stated it would address the matter on a question-by-question basis.

At trial, Williams testified over defense counsel objection that he, defendant, and Douglas practiced martial arts together. Williams further testified that defendant possessed martial arts equipment, such as "[s]words, [a] Ninja suit, stars, darts, bow and arrows." The Ninja suit, according to Williams, is a black outfit which includes "two-toed boots."

Douglas testified at trial that he and defendant practiced martial arts together. Douglas also testified that when defendant showed him the knife with blood and skin on it, he told Douglas that "his teacher told him that the blood was sacred, that you should keep the blood on the knife overnight." Although Douglas had never seen defendant with a Ninja outfit, he had seen defendant with a Ninja star and the survival knife. According to Douglas, defendant kept these things either in his basement or in the trunk of his car.

Michael Boyer testified that he had seen the sword that Williams brought to his house and defendant later retrieved. The prosecutor then asked Michael if he had ever seen defendant with any other knives, to which Michael replied that he had. Michael then identified the knife found in defendant's basement, and testified that he had seen defendant with it when defendant received

it via the United Parcel Service in February or March 1989.

Larnell also testified that he found a martial arts throwing star in the back of defendant's sister's car, which defendant drove the night of the murders.

Defendant argues that this testimony was irrelevant and highly prejudicial to his case, as the jury would associate defendant with those who practice martial arts in "Kung Fu movies on television and at the theatre." According to defendant, those who practice martial arts in such movies are portrayed as criminals or violent individuals. Defendant argues that "[a] defendant's guilt must be established by legal and competent evidence, uninfluenced by bias or prejudice raised by irrelevant evidence ***." (*People v. Bernette* (1964), 30 Ill. 2d 359, 371.) Defendant also argues that evidence that shows that a defendant has a reputation for unsavory activity is inadmissible because it is irrelevant. *United States v. Williams* (7th Cir. 1984), 739 F.2d 297, 299; *People v. Brown* (1986), 146 Ill. App. 3d 101, 105.

The evidence to which defendant objects, however, is clearly relevant and admissible. Evidence is relevant if it has "any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence." (*People v. Free* (1983), 94 Ill. 2d 378, 415.) Here, the record reveals that the following was found in defendant's basement: a knife, found to be consistent with the victim's wounds which contained blood consistent with that of the victims; two-toed Ninja shoes, which made footprints near the scene of the crime and carried human blood; black Ninja pants, which carried blood consistent with that of one of the victims; and various other martial arts weapons. Defendant and his mother, however, both testified that the items did not belong to defendant, and that defendant did not practice martial arts. The evidence that defendant practiced mar-

tial arts and possessed various martial arts weapons made it more probable that the items recovered from his basement, including the murder weapon, were in fact his. Moreover, the fact that a throwing star was found in the trunk of defendant's sister's car, which defendant used the night of the murders, makes it less plausible that the equipment belonged to someone else who might have planted the weapons in defendant's basement. Finally, the fact that defendant practiced martial arts, a Ninja-type in particular, explains why the knife had not been wiped clean. Defendant may not prevent the jury from receiving certain evidence relevant to a determination of his case simply because it is prejudicial. See *People v. Doody* (1931), 343 Ill. 194, 209.

Defendant's contention that the prosecutor "gratuitously" asked Michael if he had ever seen defendant with any other knives (other than the swords) is also without merit. The prosecutor's reference clearly referred to the murder weapon, which Michael identified immediately after this response.

## VI

Defendant's sixth contention on appeal is that he was denied his right to be free from cruel and unusual punishment under the eighth and fourteenth amendments, and to a fair and reliable penalty determination under State law, because of prosecutorial remarks during sentencing. Defendant first argues that the prosecutor improperly referred to the victim's surviving family members and friends. During closing arguments at sentencing, the prosecutor told the jury that "David and Dawn had a family. They had friends." Defendant, relying on *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207, *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, and *People v. Simms* (1988), 121 Ill. 2d 259, argues that

he was unfairly prejudiced by the prosecutor's remarks to surviving family and friends, and should be granted a new trial. We disagree.

We first note that defendant has waived this issue for review. Defense counsel failed to object to these comments at trial, and failed to include them in a post-trial motion. (*Enoch*, 122 Ill. 2d at 186-88.) Moreover, *Booth* and *Gathers* were recently overruled by *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597. The *Payne* court held that the eighth amendment poses no *per se* bar to the admission of victim impact evidence. (*Payne*, 501 U.S. at 827, 115 L. Ed. 2d at 736, 111 S. Ct. at 2609.) This court, pursuant to *Payne*, has recently held that such evidence is admissible. *People v. Howard* (1991), 147 Ill. 2d 103; see also Ill. Rev. Stat. 1985, ch. 38, par. 1401 *et seq.* ("Bill of Rights for Victims and Witnesses of Violent Crime Act").

Defendant also argues that the prosecutor denied him a fair sentencing hearing when he stated the following to the jury:

> "I'm asking you twelve what I believe to be God-fearing and members in good standing of our community, to do something that does not come natural. It does not come natural or easy to take a life. I'm not going to suggest for one minute that it's easy. But I ask you to consider what Anthony Mitchell took that night, what I suggest to you he found relatively easy and natural."

Defendant argues that it was reversible error for the prosecutor to "prey on the juror's fear of God and threaten their status as 'members in good standing of the community' " in arguing for the death penalty.

We initially note again that defendant has waived this issue for review, as defense counsel failed to object to the prosecutor's statements at trial, and failed to include the issue in a post-trial motion. (*Enoch*, 122 Ill. 2d at 186-88.) Defendant argues, however, that we should re-

view this claim under the plain error rule. We find that the comments were not improper, much less plain error.

Defendant relies on *People v. Hooper* (1989), 133 Ill. 2d 469, where the prosecutor argued to the jurors that they would lie to everyone in the court, and to God, if they did not impose the death penalty. The prosecutor argued in *Hooper*:

> " 'Every one of you on this jury raised your right hand and you swore to your Maker that you would follow the law. You were asked specifically a question by that judge, would you consider the imposition of the death penalty under certain circumstances.
>
> And the reason you twelve people are here today is because you said yes, because you said you would follow the law, the law of the State of Illinois that's written in our statutes.
>
> If you were truthful and you were being honest when you raised that right hand and swore to do your duty, and when you said, "Yes, I would consider it under certain circumstances," what other circumstances are there that could be worse than this?
>
> If this is not the case, what case are you looking for?
>
> We aren't going to have Adolph Hitler in here. We've got a mass murderer who sits in front of you.
>
> *** [If these are] not the circumstances you were saying that you would consider, then I don't know any that you ever would and you lied to the judge and to all of us here.
>
> *** And more than us, because we don't count. You lied to Somebody up there because you took an oath just like I took an oath, and I live up to my oath every day that I walk into a courtroom.' " (*Hooper*, 133 Ill. 2d at 498-99.)

This court found in *Hooper* that the prosecutor's branding of the jurors as liars to the judge, the people in the courtroom, and to God if they did not impose the death penalty could have diverted the jury's attention from its

consideration of mitigating and aggravating factors. (*Hooper*, 133 Ill. 2d at 499.) Because of this improper argument, as well as several other improper arguments, this court vacated the defendant's death penalty. *Hooper*, 133 Ill. 2d at 501.

The same is not true here. While defendant argues that the prosecutor's remarks meant that the jurors needed to fear God or fear losing their standing in the community if they failed to impose the death penalty, we find otherwise. The prosecutor's comments here clearly meant that it is difficult for God-fearing members of the jury, and those in good standing in their community, to impose the death sentence, but that this was the appropriate case. The prosecutor did not prey upon the jurors' fear of God or of losing their good standing in the community if they failed to impose the death penalty, as in *Hooper*.

## VII

Defendant next argues that he was denied a fair and reliable death penalty hearing because: (1) the trial court admitted and sent to the jury life and death photographs of the victims during deliberations of the second stage of the death penalty hearing; and (2) the prosecutor asked the jury in closing argument to view the photographs and impose a sentence of death. We disagree and further find this claim waived.

During trial, the victims' grandmother, Francine Lieneke, identified pictures of David and Dawn taken while they were alive. Later, deputy coroner Robert Shay identified two pictures of David and two of Dawn, taken at the crime scene, which showed the two as they were found, David on the floor in a pool of blood, and Dawn on a bed in a pool of blood. The State later moved to introduce the photographs. Defense counsel objected to the introduction of the photograph of David because

David was in a graduation uniform. Defense counsel argued the picture would unduly prejudice his client. The court admitted the photograph of David over defense counsel's objection. Defense counsel did not object to the life photograph of Dawn. The prosecutor then moved to admit the photographs of David and Dawn as they were found at the crime scene. Defense counsel had no objection to these pictures being admitted, but did not want them published to the jury as they would be prejudicial to defendant. The prosecutor noted that the pictures corroborate a number of witnesses' testimony, such as the positioning and finding of the bodies. The trial court allowed one picture of David and one picture of Dawn at the crime scene to be published.

Later, at the sentencing hearing, the court informed the jury that "[a]ll the evidence that was admitted and available for you during the course of the trial during the first phase of the death penalty hearing, and that was admitted during the second phase of the death penalty hearing are available for your consideration at this stage." Defense counsel did not object to this instruction.

During closing arguments at the second stage of the sentencing hearing, the prosecutor argued to the jury:

> "In considering whether there is any factor in mitigation sufficient to preclude you from imposing the death penalty in this case, you will be allowed, and I ask that you consider all the evidence again in this case from the beginning, from the start of this trial. I ask you to once again, if you want to look at the photographs of Dawn and David; David, an 18 year old man, young man; Dawn, 13. And consider if there is any mitigating factor that would keep you from imposing the death penalty for that barbaric act."

Defense counsel did not object to this argument.

Defendant now attacks the admission of photographs and the prosecutor's argument at the penalty phase as being irrelevant and highly prejudicial. Defendant, however, has waived these issues for review, as he failed to object to the introduction of Dawn's life photograph, did not object to the prosecutor's argument, did not object to the trial court's instruction concerning any evidence admitted at trial, and failed to include any of this argument in his post-trial motion. (*Enoch*, 122 Ill. 2d at 186-88.) Defendant however, urges us to find plain error and reach the merits of these claims. We do not find plain error.

However, concerning the life photographs, we do note that the Supreme Court in *Payne* recently held that victim impact evidence is admissible during sentencing proceedings in capital cases. The Court's reasoning in part was that the jury should be reminded that while the defendant must be considered as an individual, so too must the victim. The *Payne* Court noted that the victim must not be turned into a " 'faceless stranger at the penalty phase of a capital trial,' [citation]." (*Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.) The pictures of David and Dawn, and the prosecutor's argument to the jury, ensured that David and Dawn would not be "faceless strangers" at defendant's sentencing hearing. We caution, however, that *Payne* does not give the prosecution a free rein to introduce and argue anything it wants. As the *Payne* Court warned: "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." (*Payne*, 501 U.S. at 825, 115 L. Ed. 2d at 735, 111 S. Ct. at 2608.) The evidence here did not render the trial fundamentally unfair.

Concerning the photographs at the murder scene, defendant argues that the standard for determining

whether evidence is admissible at the second stage of a capital sentencing hearing is whether the evidence is relevant and reliable. (*People v. Franklin* (1990), 135 Ill. 2d 78, 110.) The decision to admit such photographs lies within the sound discretion of the trial court. (*Franklin*, 135 Ill. 2d at 110.) Photographs of the victims are generally admissible at sentencing hearings. (*People v. Kubat* (1983), 94 Ill. 2d 437, 494-95.) However, prejudice to defendant may result if the photographs are gruesome. *Franklin*, 135 Ill. 2d at 110.

Prejudice to defendant in such instances must be weighed against the photographs' probative value. (See *People v. Foster* (1979), 76 Ill. 2d 365, 378.) Here, the trial court admitted and published to the jury one photograph of David and one of Dawn as they were found at the crime scene. The pictures in question, although disturbing, cannot be said to be so gruesome as to be inadmissible. The pictures were probative of the violent nature of the criminal acts, and the trial court did not abuse its discretion in admitting each photograph.

## VIII

Defendant next contends that he was denied his right to a fair death penalty hearing under the eighth and fourteenth amendments and Illinois law, because a defense witness had extra-record communication with a juror. Defendant argues (1) a mistrial should have been declared because of the extra-record communication; and (2) the juror who had the extra-record communication lacked appreciation for her responsibility as a juror by failing to inform the court of the communication until after the death sentence had been imposed and another juror had persuaded her to inform the court. We disagree.

After the jury returned its death verdict, defense counsel notified the trial court that defendant's mother, Irene Mitchell, might have communicated with one of the

jurors, Beverly Blaies. As the trial court questioned Blaies, the following colloquy ensued:

"JUROR BLAIES: See, I'm not really sure. *** I was coming in this morning. Mrs. Mitchell was sitting on the bench with a lady, with someone else. I'm not really even sure. It was a lady, and I just heard the comment, 'I hope you slept well last night.' She could have been talking to her friend. She didn't contact me. She didn't look at me. I mean I didn't look at her. *** That was just a comment I heard.

\* \* \*

THE COURT: Did she call your name or say anything?

JUROR BLAIES: No, sir. That's why I say I'm not really sure it was—she could have been talking to her friend. She could have been talking to me, too, I don't know. She didn't approach me. She never got up.

THE COURT: Did you have any eye contact with her?

JUROR BLAIES: No, sir, I tried to avoid—no, sir, I just—I saw her as I was coming down the hall. I recognized her sitting there along with a lady friend, or a lady, and as I approached the courtroom I tried to avoid any contact with anybody that was sitting in the gallery all week, so, I just came right on in the courtroom and that's just the comment I heard. Of course, at the time I guess I kind of felt like it was directed at me, but, I don't know I'm guessing. As I said, she never—I never had any eye contact or physical contact. My name wasn't used."

Blaies further told the court that she did not tell anyone about the incident until after the jury was discharged. Blaies told another juror, Carol Mercer, about the possible comment after the death sentence had been decided and when the jurors were in the hall discussing the possibility of repercussions by defendant's family. The fact that Blaies heard the comment in no way frightened her, or influenced or affected her decision. Blaies also had not thought about the incident during

trial, and it did not concern her. Blaies did not even think about informing the court about the comment, for she was unsure whether it was even directed at her. Even after trial, Blaies was unsure whether the comment was directed at her.

Mercer, whom Blaies informed of the comment, was also questioned by the court. Mercer stated that Blaies told her of the comment after the jury had decided to impose the death sentence and had signed the verdict form. Nothing was changed as a result of the comment.

The trial court denied defendant's motion for a mistrial and motion for a full evidentiary hearing on the matter.

This court in *People v. Harris* (1988), 123 Ill. 2d 113, set forth the law concerning extra-record communication with jurors:

> "It is well settled in Illinois that any communication with a juror during trial about a matter pending before the jury is deemed presumptively prejudicial to a defendant's right to a fair trial. Although this presumption of prejudice is not conclusive, the burden rests upon the State to establish that such contact with the jurors was harmless to defendant. (*Remner v. United States* (1954), 347 U.S. 227, 229, 98 L. Ed. 654, 655, 74 S. Ct. 450, 451; see *People v. Rettig* (1972), 50 Ill. 2d 317; *People v. Buckhana* (1981), 99 Ill. App. 3d 889.) A verdict will not be set aside where it is obvious that no prejudice resulted from a communication to the jury, either by the court or by third persons outside the presence of the defendant. (*People v. Mills* (1968), 40 Ill. 2d 4.) The trial court has substantial discretion in determining whether an improper contact with a juror has caused prejudice to the defendant. See *People v. Buckhana* (1981), 99 Ill. App. 3d 889; see also *United States v. Delaney* (8th Cir. 1984), 732 F.2d 639." *Harris*, 123 Ill. 2d at 132-33.

Here, the trial court found that the contact between Irene Mitchel and juror Blaies, if such contact even ex-

isted, was not prejudicial to the defendant. We cannot say that the trial court abused its discretion in this finding.

Defendant, however, argues that *People v. Jones* (1985), 105 Ill. 2d 342, is analogous to the instant case. In *Jones*, a juror brought to the jury room two copies of a racial "joke" which contained denigrating racist comments insulting to black people after the conclusion of defendant's case, but before rebuttal. The defendant in *Jones* was black, and the jury was all white. The trial court excused the juror who brought the racist material, but found no prejudice even though three of the other jurors on the panel had seen the material. On appeal, this court reversed stating, "[T]here are circumstances which create 'such a probability that prejudice will result that [the trial] is deemed inherently lacking in due process.' [Citation.] Such circumstances are present here." *Jones*, 105 Ill. 2d at 352.

The instant case, however, does not present the same situation as in *Jones*. Here, Blaies did not even know if the comment was directed at her, did not inform any other juror of the possible comment until the death sentence had been decided, and stated that the comment did not affect her in any way in voting to sentence defendant to death.

Defendant also argues that Blaies' possible consideration of an improper factor at capital sentencing violated the eighth amendment's proscription on cruel and unusual punishment. Defendant relies on *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733, which affirmed a sentence of death even though the jury had considered a statutory aggravating factor which the State supreme court later found to be invalid. However, Blaies repeated several times that she did not even think about the comment until after the verdict had been signed and the other jurors were talking about possible

repercussions. The trial court, which has great discretion in this matter, found no prejudice to have resulted. We cannot disagree with the trial court's finding.

Defendant finally argues that the fact that Blaies did not inform the court of Mitchell's comment until persuaded to do so after the verdict by Mercer reveals that Blaies lacked appreciation for her responsibility as a juror. In *Jones*, this court noted that the fact that the jurors did not inform the court of the racist material may have indicated that the jurors lacked appreciation for their responsibility as jurors, or that they did not consider the material offensive. (*Jones*, 105 Ill. 2d at 352.) Here, however, Blaies did not even know whether the comment was directed towards her. She only heard it as she walked past Mrs. Mitchell. The trial court found no prejudice, and again, we do not disagree.

## IX

Defendant's next contention is that he was denied a fair death penalty hearing because the trial court admitted and sent to the jury during deliberations at the second stage of capital sentencing a copy of the presentence investigation report which had certain aggravating circumstances, which the prosecutor elicited at the hearing, highlighted with a yellow marker. We find that defendant has waived this issue for review.

At the second phase of defendant's capital sentencing hearing, defendant called Michael Buettner, a probation officer with the St. Clair County probation department. The prosecutor elicited the following facts from Buettner on cross-examination: (1) defendant's employment record indicated his only employment had been a Grants Department job between April 21, 1986, and June 13, 1986; (2) defendant had a valid Illinois driver's license; and (3) defendant told Buettner he was in good health and that his family had no history of mental illness. These facts

were contained in defendant's background report which Buettner compiled. This report, People's exhibit number 1, was introduced at the sentencing hearing. Defense counsel had no objection to the report's introduction.

In his closing argument, the prosecutor argued to the jury that it should consider defendant's "family history, and prior contacts with the law," and the fact that defendant had not worked and was not mentally retarded. The court instructed the jury that all the evidence admitted during the hearing was available to it for its consideration.

The background report in the record, which was given to the jury, has the following items highlighted with a yellow marker: (1) the pertinent dates concerning defendant's employment, April 21, 1986, and June 13, 1986; (2) the fact that defendant "considers himself in good health at this time"; and (3) that defendant stated there was "no history of mental illness on either side of his family." Defendant "assumes" that because no other items were marked by the jury, and because the record does not disclose that the court or defense counsel inspected the report, "the prosecutor highlighted his copy of the presentence report before tendering it as an exhibit."

Defendant further argues that while the report might have been relevant and reliable, it was not so after it had been highlighted. (*People v. Free* (1983), 94 Ill. 2d 378, 413-14 (evidence must be relevant and competent).) Moreover, defendant argues, the trial court abused its discretion in sending the report to the jury because it failed to inspect it before it went to the jury. (*People v. Olinger* (1986), 112 Ill. 2d 324, 348-49 (trial court has discretion to send items to the jury).) Defendant asks that his death sentence be vacated and the matter remanded for a new sentencing hearing.

We note, however, that defendant has waived this issue for review. Defense counsel had no objection to the report being admitted, and failed to include the claim in his post-trial motion. (See *People v. Flores* (1989), 128 Ill. 2d 66, 99.) We further find no plain error here, and note that it is unknown who highlighted the copy, as the jury may well have done so in going over the report.

## X

Defendant's final two arguments on appeal concern the constitutionality of the Illinois death penalty. Defendant first contends that the Illinois death penalty statute is unconstitutional because it places a burden of proof on the defendant which prevents meaningful consideration of mitigation. Defendant argues that instead of limiting the death penalty to cases where mitigation does not outweigh aggravation or is not " 'sufficiently substantial to call for leniency' " (*Walton v. Arizona* (1990), 497 U.S. 639, 644, 111 L. Ed. 2d 511, 522, 110 S. Ct. 3047, 3052, quoting Ariz. Rev. Stat. Ann. §13—703(E) (1989)), Illinois requires the death penalty if mitigation is not "sufficient to preclude" the death penalty. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).) Defendant notes that Webster's New World Dictionary defines "preclude" as "to make impossible, especially in advance." (Webster's New World Dictionary (1976).) Defendant then argues that once a sentencer has found that death is a possible sentence for a defendant, it must then determine whether death is an impossible sentence, that is, whether it is *precluded* by mitigating evidence. Defendant argues that a death sentence cannot be simultaneously possible and impossible, and thus only sentencers who refuse to follow the law are able to not impose the death penalty. Defendant believes this procedure prevents sentencers from giving effect to valid mitigating evidence, for nothing can preclude that which is possible.

Defendant's argument is without merit, for the Illinois death penalty statute does not make a sentence of death simultaneously possible and impossible. Once a defendant has been found eligible for the death penalty (or, as defendant argues, that death is a possibility), the sentencer is not then asked to determine once again whether the defendant is eligible for the death penalty, as defendant infers. Instead, the sentencer is asked to determine whether the defendant, who is eligible for the death penalty, will receive that penalty. The fact that a sentencer finds a defendant eligible for the death penalty, but then does not impose that sentence, does not mean that death was never a possibility for the defendant or that a sentence of death is simultaneously possible and impossible.

Moreover, the jury is not prevented from considering mitigating evidence because it has already found the defendant eligible for the death penalty and, as defendant argues, nothing can preclude that which is possible. As the State notes, Webster's New World Dictionary defines "preclude" as "to make impossible, especially in advance; shut out; *prevent.*" (Emphasis added.) (Webster's New World Dictionary (1976).) The jury considers mitigating evidence, and if it is sufficient to preclude, or prevent the imposition of the death penalty, that sentence will not be imposed. We further note that this court has previously held that the Illinois death penalty statute does not place an impermissible burden of proof on defendants. (*People v. Bean* (1990), 137 Ill. 2d 65.) Federal courts have reached the same conclusion. See *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986; *Williams v. Chrans* (7th Cir. 1991), 945 F.2d 926.

## XI

Defendant's second argument concerning the constitutionality of the Illinois death penalty is that it does not sufficiently minimize the risk of arbitrarily or capri-

ciously imposed death sentences. In arguing this, defendant asks us to reconsider various arguments concerning the constitutionality of the Illinois death penalty statute which he concedes have already been found by this court to be without merit. We decline to reconsider these arguments.

## CONCLUSION

For the reasons set forth above, defendant's convictions and sentence are affirmed. The clerk of this court is directed to enter an order setting Wednesday, January 13, 1993, as the date on which the sentence of death, entered in the circuit court of St. Clair County, is to be imposed. Defendant shall be executed in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*