No. 4-22-0910
Order filed March 13, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* C.B., a Minor | ) | Appeal from the Circuit Court |
| | ) | of McLean County. |
| | ) | |
| | ) | No. 21-JD-73 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Jason Chambers, |
| Appellee, v. C.B., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice McLaren and Justice Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court erred in committing respondent to the Department of Juvenile Justice. Accordingly, the order of commitment is vacated and the matter remanded for a new sentencing hearing.

¶ 2    In March 2022, the circuit court of McLean County adjudicated respondent, C.B. (born December 26, 2006), a delinquent minor after he was found guilty of four counts of child pornography. In September 2022, following a sentencing hearing, the court committed respondent to the Department of Juvenile Justice (Department) for an indeterminate term not to exceed his 21st birthday. Respondent appeals, arguing that the case should be remanded for a new sentencing hearing because the trial court failed to comply with the statutory requirements set forth in section

5-750(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-750(1) (West 2020)) prior to committing him to the Department. For the reasons set forth below, we vacate the order committing respondent to the Department and remand the matter for a new sentencing hearing.[1]

¶ 3                                    I. BACKGROUND

¶ 4                        A. Petition for Adjudication of Wardship

¶ 5     On September 9, 2021, the State filed a petition for adjudication of wardship in McLean County case No. 21-JD-73. The petition asserted that respondent was delinquent because he had committed four counts of child pornography. Two of the counts alleged that on or about February 28, 2021, respondent "knowingly videotaped, or otherwise depicted by means of any similar visual medium or reproduction or depiction by computer of E.C., a child whom the respondent minor knew to be under the age of 18 years" while she actually engaged in an act of sexual penetration or sexual conduct with respondent, in violation of section 11-20.1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-20.1(a)(1) (West 2020)). The other two counts alleged that on or about April 14, 2021, respondent "with the knowledge of the content thereof, and with the intent to disseminate, exhibited a videotape, film or other similar visual reproduction or depiction by computer of E.C., a child whom the minor knew was under the age of 18 years" which did show E.C. actually engaging in an act of sexual penetration or sexual conduct with respondent, in violation of section 11-20.1(a)(1)(vii) of the Code (720 ILCS 5/11-20.1(a)(1)(vii) (West 2020)).[2]

_____

[1] This appeal was transferred from the Fourth District to the Second District pursuant to Illinois Supreme Court Order M.R. 31650 (eff. Feb. 6, 2023).

[2] In the petition for adjudication of wardship, the counts alleging that respondent disseminated child pornography cite only to section 11-20.1(a)(1)(vii) of the Code (720 ILCS 5/11-

All four counts are classified as Class X felonies. 720 ILCS 5/11-20.1(c) (West 2020). At some point, respondent was placed on home confinement with electronic monitoring.

¶ 6                            B. Trial

---

20.1(a)(1)(vii) (West 2020)). That provision describes the offense of child pornography when a person "films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction or depicts by computer any child whom he or she knows to be under the age of 18 *** where such child *** is *** depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the unclothed or transparently clothed genitals, pubic areas, buttocks, or, if such person is a female, a fully or partially developed breast of the child or other person." 720 ILCS 5/11-20.1(a)(1)(vii) (West 2020). The statute making the dissemination of child pornography an offense is set forth in section 11-20.1(a)(2) of the Code (720 ILCS 5/11-20.1(a)(2) (West 2020)), a separate provision. We note, however, that defendant does not allege that the State's failure to cite to section 11-20.1(a)(2) of the Code in the petition for adjudication of wardship prejudiced him. See, *e.g.*, *People v. Cohn*, 2014 IL App (3d) 120910, ¶ 14 (noting that mere reference in charging instrument to an incorrect section of a statute is a formal rather than substantive defect that is grounds for reversal only where the defendant demonstrates prejudice); *People v. Burke*, 362 Ill. App. 3d 99, 103 (2005) (holding that a defect in a statutory citation in a charging instrument does not warrant reversal where the charging instrument adequately informs the defendant of the charges and the defendant cannot demonstrate prejudice from the incorrect citation); *People v. Melton*, 282 Ill. App. 3d 408, 415-16 (1996) (observing that posttrial claim that charging instrument cited incorrect statute does not warrant reversal unless the defendant was prejudiced by the incorrect citation).

¶ 7    The matter proceeded to a bench trial on March 17, 2022. The State's first witness was E.C. E.C. testified that she was born on October 9, 2007, and that she met respondent when she was 12 years of age. On February 28, 2021, E.C. and respondent exchanged messages on Snapchat. Later that same day, E.C. went to respondent's house where she and respondent had oral and vaginal intercourse on the front porch of respondent's home. During the interaction, E.C. noticed that the flash on respondent's phone was illuminated. This indicated to E.C. that respondent was recording the interaction. E.C. did not ask respondent to cease recording. Subsequently, E.C.'s brother told her that videos of her interaction with respondent had been circulated on Snapchat and Instagram. E.C. testified that she cried when she found out the videos had been posted. After a break, E.C. was recalled as a witness by respondent's attorney. At that time, E.C. testified that she had been asked to "drop the charges" against respondent. E.C. further added that she "didn't want to pursue this."

¶ 8    Next, the State called Detective Tyrel Klein of the Bloomington Police Department. In May 2021, Klein was assigned to investigate a report involving the potential dissemination of sexual images of a minor. As part of the investigation, Klein contacted E.C.'s mother to schedule an interview of E.C. at the Child Advocacy Center. Klein watched the interview remotely via Zoom. During the interview, Klein learned of a Snapchat account with a username associated with respondent. Klein served a preservation request on Snapchat with respect to that account. Klein testified that the subscriber information supplied by Snapchat matched the username provided by E.C. during her interview. Klein also received a data file from Snapchat. The data file contained two videos of respondent and E.C. Klein testified that both of the videos had been disseminated via respondent's Snapchat account. In viewing the files, Klein determined that the videos of E.C. and respondent were first sent on March 4, 2021, and that they were sent at least 16 times in total.

On cross-examination, Klein testified that during the interview, E.C. said that the contact between her and respondent was consensual.

¶ 9    Following Klein's testimony, the State rested. Respondent elected not to testify. After closing arguments by the parties, the court entered an order (1) finding the allegations of the four counts set forth in the petition for adjudication of wardship had been proven beyond a reasonable doubt and (2) adjudicating respondent a delinquent minor. The court continued the matter for sentencing pending the preparation of a sentencing report and a sex offender evaluation. The sentencing hearing was eventually scheduled for September 22, 2022.

¶ 10                 C. Social Investigation Report and Sex Offender Evaluation

¶ 11    On September 15, 2022, Dawn Marseilles, an intake officer with Juvenile Court Services filed a social investigation report (Report) that she prepared for the sentencing hearing. The Report provided that in addition to being sentenced in case No. 21-JD-73, respondent would be sentenced in two other McLean County cases—case No. 21-JD-63 and case No. 22-JD-35. For context, in case No. 21-JD-63, respondent was convicted, following a bench trial, of two counts related to the May 2021 theft of a bicycle valued at $629.94. In case No. 22-JD-35, respondent admitted to one count of child pornography. The offense in case No. 22-JD-35 occurred in April 2022, when respondent, during a live video broadcast on social media, walked into a room where a female, T.T., was having intercourse with respondent's cousin. Respondent was out of the room when he began recording and had about a 50% guess as to whether T.T. and his cousin were "doing sexual things" when he walked in. Respondent denied having an intent to show a live video.

¶ 12    The Report showed that respondent had numerous prior police contacts, but, other than a 2018 ordinance violation and the three cases for which he was being sentenced, none of them resulted in court dispositions. Regarding respondent's educational history, the Report noted that

an individualized education plan from 2021 indicated that respondent had been diagnosed with attention-deficit hyperactivity disorder (ADHD). The Report further provided that respondent most recently attended the Regional Alternative School (RAS) but earned no credits due to a lack of attendance. The principal of RAS reported that respondent would not be able to attend RAS during 2022 because of "conflicts with peers on both the morning and afternoon schedules." The assistant principal at Bloomington High School stated that respondent would not be approved to return to a "normal" schedule there "due to the severity of his actions that led to the transfer to RAS last school year." However, Bloomington High School agreed to provide respondent "homebound tutoring" for at least the first semester of the school year before reassessing the possibility of respondent returning to either Bloomington High School or RAS.

¶ 13    The Report provided that respondent has a close group of friends he had known since he was young. Anntionetta Rountree, respondent's mother, stated that she was concerned about the activities respondent engaged in with his friends. Rountree was worried for respondent's safety because "she believes her son and his friends have made dangerous enemies around town." The Report noted that in July 2022, shots were fired at the apartment where respondent and Rountree resided. As a result, respondent moved in with a family member for three days until Rountree felt it was safe for him to return home. The Bloomington Police Department indicated that respondent is associated with the Take Down Gang, "a hybrid gang in Bloomington that has been around for at least 2 years." According to the Report, "[e]ight guns have been taken off the members [of the Take Down Gang] and they have been involved in several incidents of gun fire."

¶ 14    The Report stated that respondent denied drinking alcohol. He acknowledged using cannabis, although not regularly. According to Rountree, however, respondent drinks often and has sent her Snapchat pictures of himself drinking alcohol on the porch of their apartment.

Rountree also reported that respondent uses cannabis daily, and she described his cannabis usage as "excessive." Respondent acknowledged that he angers easily. He stated that he typically handles his anger by yelling but apologizes after he has calmed down. Rountree stated that respondent "often takes out his anger by breaking things and doing damage to her home." Rountree had concerns about being evicted from her apartment due to the extensive damage respondent does to the unit when he does not get his way. The Report noted that respondent was not willing to discuss the offenses for which he was before the court. To this end, when respondent was asked to complete a form titled "Minor's Version of the Offense," he wrote "I DO NOT WANT TO MAKE A STATEMENT!!!"

¶ 15 The Report noted that respondent recently completed a sex offender evaluation (Evaluation) through ABC Counseling and Family Services (ABC). The Report stated that, according to Laura Jennings-Mitchell, the executive director of ABC, respondent had "some issues with attendance throughout the process of completing the evaluation; however, when he was present, he was cooperative and open with his evaluators."

¶ 16 Based on the totality of the interview with respondent, Marseilles opined that respondent "does not feel remorse for his actions nor see the need to make things right." Marseilles continued that "[t]hroughout the entirety of *** [the] interview with [respondent], his responses appeared to be dishonest and intended to make [Marseilles] believe that he is innocent of the allegations against him. He was not forthcoming about the severity of his drug and alcohol usage and laid blame on the school for why he has not been successful academically. In general, [respondent] fails to take responsibility for his actions." Ultimately, Marseilles concluded that respondent needed counseling and services to assist him with getting caught up academically, to address his substance abuse, to minimize his risk-taking behaviors, to identify pro-social peers, and to address sexually

problematic behavior as recommended by the Evaluation. Marseilles added that "[a] term of probation is available to provide enforcement of the Court Order and referrals for supportive services."

¶ 17　A copy of the Evaluation, dated September 13, 2022, was attached to the Report. The evaluators met with respondent for 11 sessions and rated his attendance as "[g]ood." At the time of the Evaluation, respondent was under house arrest and residing with Rountree (his mother). According to the Evaluation, respondent presented as a "friendly teenager" who was "cooperative, willing, and open with the evaluators." The Evaluation stated that although respondent "was willing to discuss his reason for referral early in the assessment process, it appeared that he was guarded with what information he was sharing." However, "[a]s the assessment progressed, [respondent] became more comfortable answering questions that were specific to the allegations and the behaviors he was engaged in." The Evaluation added that respondent was "fully engaged in conversations and completed assessment tools as asked." The Evaluation also provided that respondent "appeared to be fairly *** honest," he would ask for clarification if he did not understand a question, and he "appeared to think critically before he answered" questions.

¶ 18　Respondent reported that he had been diagnosed with ADHD, but he could not remember when or by whom. Respondent also reported that he smokes marijuana more than once a day. He indicated that he began smoking marijuana at age eight or nine. Respondent did not think he has a drug problem, but acknowledged that his mother and brother are of the opposite belief. The Evaluation noted that there were two sessions at which respondent may have been under the influence of marijuana.

¶ 19　As part of the Evaluation, the evaluators interviewed Rountree. Rountree explained that respondent had been expelled from school after a fight. Rountree stated that respondent had several

close friends that he has known "since diapers." Rountree described these friends as "good kids" who "all have jobs," although she was concerned about one friend who is now incarcerated. Rountree further stated that respondent is close with his siblings, two of whom reside in Minnesota and one of whom is in prison. Rountree also noted that respondent had a sister who passed away. Rountree opined that respondent was "in denial" about his sister's death. She noted that respondent never talks about his sister even though he privately cries about her passing.

¶ 20    Regarding respondent's court involvement, Rountree stated that she talked to respondent about "how 'exposing girls' is wrong and that he should not share the things he records." Rountree reported "feeling fine about [respondent] recording other girls because 'they all record each other' these days." Rountree stated that she explained to respondent that when he shares the materials he records, "it's 'child porn because they're kids.' " Rountree stated that respondent understood that he could not do that anymore. Nevertheless, he expressed his belief that "they 'are all kids' so it shouldn't be as big of a deal." Rountree was concerned about respondent's drug use. She stated that respondent "smokes 'weed all day, every day' and that he was 'probably high when he came in' for his session." Rountree felt that respondent is not motivated for anything other than to get high and that he is not open to getting treatment for his marijuana use.

¶ 21    During respondent's clinical interview, he answered "true" to the statement "If I try and have sex with somebody and they don't try to stop me the whole time, it would not be called rape." Respondent also answered "true" to the statement "[t]he more afraid a person has become, the more turned on I have become." When asked about the inappropriate behaviors in which he engaged, respondent indicated that he was "just playing around." Respondent felt 50% responsible for his behavior while "the other person is responsible for the other 50%" because she "knew what was going on." Respondent stated that he was "wrong for recording" on the first child pornography

charges and that he "didn't know it would get [him] in trouble." He later stated that the recording "wasn't the problem," rather "the problem was when the videos got out." Respondent admitted that he had "things to work on," but added that they "weren't sexual." He stated that he would "like to work on 'me in general' and learning to slow down and think."

¶ 22 Among the assessment tools administered as part of the Evaluation were the Behavior Assessment System for Children, Third Edition (BASC-3), the Protective + Risk Observations for Eliminating Sexual Offense Recidivism (PROFESOR), and the Multiphasic Sex Inventory (MSI). The BASC-3 indicated that respondent had trouble with his sense of inadequacy and hyperactivity. The PROFESOR indicated that respondent had "[r]espectful sexual interests in age-appropriate partner," was "[r]esponsive to reasonable guidance and support," and "[f]eels close to and supported by a parent/caregiver." However, the PROFESOR also indicated that respondent had "[p]oor awareness of [the] consequences of sexual offending," a "[l]ack of emotional intimacy and/or close friendship with prosocial peer," a "[w]eak commitment to and/or engagement in school and work," and a "[w]eak commitment to and/or engagement in organized leisure activity." The PROFESOR placed respondent in "Category 3," meaning that he would be best served by moderate intensity intervention focused on developing healthy sexual relationships in the future. The MSI suggested that respondent was "attempting to present an asexual image and f[ell] within the 'fake good' range." The MSI also suggested that respondent "justifies sexual deviance and is not accepting responsibility for his actions and is not motivated for treatment." Additionally, the Evaluation reported that respondent gave conflicting answers about his interest in sex.

¶ 23 The Evaluation concluded that both respondent and Rountree minimized respondent's sexual behaviors and attempted to justify the behaviors on the basis of gender and age. For instance, the Evaluation stated that Rountree "had a 'boys will be boys' attitude and continued to

state throughout the parent interview that 'they were both kids.' " Rountree also stated that she believes it is okay for children to record themselves during sex acts, but they should not share the recordings. The Evaluation stated that because respondent described Rountree as "his greatest support," she needs to increase her understanding of healthy, age-appropriate behaviors so that she may be involved in respondent's treatment.

¶ 24    The Evaluation made 11 recommendations, including that respondent should (1) continue to engage in counseling to reduce risk factors related to sexual offending and to process his past traumatic experiences; (2) engage in psycho-education about sex and sexuality; (3) engage in substance-abuse treatment; and (4) decrease his symptoms of ADHD. In addition, the Evaluation suggested that respondent's family be involved and included in his treatment. Respondent agreed that there are topics that he would benefit from processing in counseling and indicated that he planned to return to counseling after sentencing. Respondent also voiced a desire to return to school.

¶ 25                                D. Sentencing Hearing

¶ 26    The sentencing hearing was held on September 22, 2022. As noted earlier, the sentencing hearing involved case No. 21-JD-73 as well as case Nos. 21-JD-63 (two theft counts) and 22-JD-35 (child pornography). At the beginning of the hearing, the court noted that a copy of the Report, a copy of the Evaluation, and an electronic monitoring report had been filed. The State then presented two documents for the court's consideration: (1) the Department's Comprehensive Youth Development and Reentry Planning Model and (2) the Department's Quarterly Report for July 2022. The State also called T.T., the victim in case 22-JD-35, to present a victim impact statement. T.T. stated that she felt embarrassed and disrespected and she did not want to go out in

public after the video of her was shared on social media. Following T.T.'s statement, the State rested.

¶ 27 Respondent's attorney then called Rountree to testify. Rountree recounted that T.T. has tried to contact respondent multiple times and threatened to shoot her house during an Instagram Live broadcast. Rountree further testified that during the course of case No. 22-JD-35, the house where she and respondent reside was shot at twice. Rountree also explained that respondent is unable to attend school because of a no-contact order involving the parties in these cases. As a result, respondent "goes to the library for an hour a day and works with a tutor." Rountree related that she is in counseling and opined that respondent would benefit from community support and counseling. Rountree explained that respondent has experienced several episodes of trauma. Rountree recalled, for instance, that she went to prison when respondent was 12 years of age. As a result, respondent was placed with the Illinois Department of Children and Family Services and moved around five or six times. Further, during this time, respondent's sister was murdered. Rountree believed that "probation would be a great first step with helping [respondent] to be the young man that [she] know[s] he can be" and "reach[ing] his full potential." Rountree added that if respondent is sentenced to probation, other family members would help supervise him, especially while she was at work.

¶ 28 On cross-examination, Rountree stated that respondent's behavior "[a]bsolutely *** concerns [her]." Moreover, while acknowledging that it is not "right" to record females engaging in sexual activity, she stated that "[t]his is what kids [respondent's] age are doing." The State asked Rountree if respondent were placed on probation, "what source of support would be there to ensure that [respondent is] not using drugs or getting involved in these sorts of activities?" Rountree responded that she would tell respondent not to do such things and also that he would be

accountable to a probation officer. Rountree added, "if he's on probation and he violates, then he knows the jail is an option." Although the Bloomington Police Department indicated that respondent is affiliated with a gang, Rountree denied the assertion. Rountree explained that she "know[s] what it looks like to have gang affiliation, and [respondent] doesn't throw up gang signs *** he don't color specific [*sic*]."

¶ 29 The State acknowledged that respondent does not have an extensive history of adjudications. It noted, however, that the matter was before the court for sentencing on three separate convictions. The State argued that removal from the home is in the best interest of respondent and commitment to the Department is the least restrictive alternative "because the minor and his mother do not take rehabilitation seriously." In support of its position, the State observed that respondent was "picked up" in case No. 22 JD 35 on another child pornography charge after he was convicted of child pornography in case No. 21-JD-73. The State also cited the fact that, when asked to make a statement for the Report, respondent "wrote 'I do not want to make a statement' with three big exclamation points afterward." Additionally, the State noted that during her interview for the Evaluation, Rountree "reported feeling fine about [respondent] recording other girls because they all record each other these days." The State also referenced (1) the findings in the Evaluation that respondent justifies sexual deviance, does not accept responsibility for his actions, and is not motivated for treatment; (2) the Bloomington Police Department's report that respondent is associated with a gang; (3) respondent's drug use; and (4) respondent's lack of progress in school.

¶ 30 Respondent's attorney argued for a term of probation. In support of this recommendation, respondent's attorney asserted that none of respondent's three cases involved violence and that respondent's only adjudication prior to those cases was for an ordinance violation in 2018.

Respondent's attorney also argued that the child pornography conviction involving respondent and E.C. was "a little bit different than your average sex case[]" because the activity between respondent and E.C. was "consensual," it involved two minors, there was no allegation of "inappropriate touching," and it concerned the distribution of videos. Based on Rountree's testimony at the sentencing hearing, respondent's attorney disputed the State's claim that she was not taking the situation seriously. He also argued there was no documentation to support the police department's claim that respondent is involved in a gang. Nor was there any suggestion that the offenses at issue were gang related. Respondent's attorney noted that before the court can commit a juvenile to the Department, it must conclude that such placement "is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement." See 705 ILCS 405/5-750 (West 2020). Respondent's attorney argued that the State failed to present any information "about looking into less restrictive alternatives than [the Department] or any reasons why efforts were unsuccessful to locate those." Respondent's attorney further noted that the statute requires the court to review several other factors, including the offender's age, criminal background, educational background, physical, mental, and emotional health, and community-based services. See 705 ILCS 405/5-750 (West 2020). Reviewing these factors, counsel noted, *inter alia*, that respondent was only 14 at the time of the offenses, his criminal background consisted of one ordinance violation, and there was no evidence whether respondent was compliant with any community-based services because none were attempted. Respondent's attorney therefore argued that the statutory factors supported a sentence of probation and asserted that the minimum term of 24 months' probation mandated by the statute was appropriate.

¶ 31    In pronouncing sentence, the trial court stated that it had considered the testimony and information presented at the sentencing hearing as well as the Report, the Evaluation, the exhibits, and the parties' arguments. The court also stated that it had considered the statutory factors (see 705 ILCS 405/5-750(1) (West 2020)), including respondent's age, the absence of a significant prior criminal background, and educational background. With regard to the latter, the court stated that it was "frustrat[ed]" that respondent was unable to attend either RAS or Bloomington High School. The court also noted its concern that respondent "earned no [school] credits for one year due to a lack of attendance." The court stated that although respondent had not been on probation before, his problems "taking part in something structured like school" "can be a reflection of [whether] *** [he is] going to take part in something like probation" or counseling.

¶ 32    Additionally, the court observed that substance-abuse services would be available to respondent both in the community and within the Department. The court questioned whether respondent would participate in such services in a community-based setting. The court opined, however, that respondent would be incentivized to engage in those services with the Department because it could reduce the amount of time he spent there. The court also noted that respondent had access to community-based sex-offender treatment, but said it had concerns about his attendance given his school absences. With respect to respondent's participation with the Evaluation, the court noted that respondent participated when he attended, "but it's still noted that there were attendance issues." The court stated that it was "positive" that respondent took part in the Evaluation when he was present, but "concerning" that respondent was "deciding when [he] think[s he] need[s] to show up and address the issues." The court opined that respondent did not understand that it is not his "call." The court stated that its decision was based "a lot" on the fact

that it did not know how respondent would comply with the requirements of probation since he had not been on probation before.

¶ 33    The court said that it was considering the fact that respondent was being sentenced on multiple cases. The court indicated that if the cases were considered alone it would be easier to conclude that respondent did not understand what he was doing or the consequences of his actions. The court noted that it had explained to respondent why the initial child pornography offenses (case No. 21 JD 73) were crimes and yet he still committed another child pornography offense (case No. 22 JD 35). The court then stated:

> "So, my concern is you didn't get it after that first time, and then you did it again. If I give you another chance, am I going—what are the chances that I'm going to have another victim in front of me? And, you know, that's guessing, but it is a factor that I'm considering, the fact that I have two cases with two different victims and one that happened after an adjudication on the first. And that is a significant factor for me."

The court therefore found that respondent's parents are unable for some reason other than financial circumstances alone, to care for, protect, train, or discipline him. The court further found that removal from the home was in the best interest of respondent, respondent's family, and the public. The court added, "I'm not going to find that reasonable efforts have been made to prevent or eliminate the need for the minor to be removed from the home. Because I don't have enough in front of me on that, but I am going to find that reasonable efforts cannot at this time for good cause prevent or eliminate the need for removal." Furthermore, the court found that commitment to the Department was the least restrictive alternative "based on the efforts, based on the evidence that efforts were made to locate a less restrictive alternatives [*sic*] to secure confinement and that those

efforts would be unsuccessful." Accordingly, the trial court committed respondent to the Department for an indeterminate period not to exceed his 21st birthday.

¶ 34    Immediately after the court's pronouncement, respondent ran out of the courtroom. The parties subsequently reviewed the written order of commitment with the court. In paragraph four of the written order, the court wrote that commitment to the Department "is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and those efforts were unsuccessful because: Minor has not shown [a] willingness to engage [with] counseling or school. Minor has shown [a] lack of remorse [and] accountability or [an understanding of] why he should engage in treatment/services. Minor has shown he is a risk to members of community." The court then continued the matter to the following day to admonish respondent.

¶ 35    When the hearing continued the following day, the court noted that respondent "sprinted out of the courtroom" the previous day. The court further noted that respondent was caught in the hallway and that after he was caught, the people in the courtroom "could hear [respondent] yelling references to hurting himself." Thereafter, the court admonished respondent regarding his rights. On October 12, 2022, respondent filed a notice of appeal, which he subsequently amended.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, respondent urges this court to remand his case for a new sentencing hearing because the trial court failed to comply with the mandate of section 5-750(1) of the Act (705 ILCS 405/5-750(1) (West 2020)) before committing him to the Department for an indeterminate term. Specifically, respondent contends that the court failed to comply with its duty under section 5-750(1) of the Act (705 ILCS 405/5-750(1) (West 2020)) and determine whether commitment to the Department "is the least restrictive alternative based on evidence that efforts were made to

locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement." Respondent acknowledges that this issue was not raised in a motion to reconsider sentence, but asserts that juveniles are not required to file a postadjudication motion to preserve an issue for appeal. See *In re Samantha V.*, 234 Ill. 2d 359, 368 (2009); *In re W.C.*, 167 Ill. 2d 307, 327 (1995).

¶ 38    The State responds that respondent forfeited this claim by failing to raise the issue at trial or in a posttrial motion. See *In re Javaun I.*, 2014 IL App (4th) 130189, ¶ 38; *In re Raheem M.*, 2013 IL App (4th) 130585, ¶ 51. Forfeiture notwithstanding, the State argues that the trial court satisfied the statutory requirements for commitment to the Department. In this regard, the State asserts that the trial court was presented with ample evidence of respondent's inability to comply with a sentence that did not involve his commitment to the Department.

¶ 39                             A. Forfeiture

¶ 40    Generally, a criminal defendant forfeits review of a claimed error if he or she does not object at trial or fails to raise the issue in a posttrial motion. *In re M.W.*, 232 Ill. 2d 408, 430 (2009). " 'This principle encourages a defendant to raise issues before the trial court, thereby allowing the court to correct its errors *** and consequently precluding a defendant from obtaining reversal through inaction.' " *M.W.*, 232 Ill. 2d at 430 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007)). "This same forfeiture principle applies in proceedings under the Juvenile Court Act [of 1987], although no postadjudication motion is required in such cases." *M.W.*, 232 Ill. 2d at 430; see also *Samantha V.*, 234 Ill. 2d at 368 (noting that minors are not required to file a postadjudication motion to preserve an error for review); *W.C.*, 167 Ill. 2d at 327 (same).

¶ 41    At the outset, we note that respondent's attorney did not object when the trial court pronounced sentence. However, in *People v. Saldivar*, 113 Ill. 2d 256, 266 (1986), the supreme

court held that to preserve a claim of error made by the trial court during sentencing, the defendant is not required to interrupt the court and identify the error. In *Saldivar*, the defendant was found guilty of voluntary manslaughter. At the sentencing hearing, the court commented that the defendant's conduct caused death and that a human life was taken. Further, the court found " 'the terrible harm that was caused to the victim' " to be the primary statutory factor in aggravation. *Saldivar*, 113 Ill. 2d at 264. The defendant did not object to the trial court's comments during the sentencing hearing. On appeal, the defendant argued that the trial court improperly considered an element of the offense as an aggravating factor at sentencing. The State responded that the defendant forfeited the issue by, *inter alia*, failing to make a contemporaneous objection or raise the issue in a posttrial motion. In rejecting the State's argument, the supreme court focused on an argument defense counsel made at the sentencing hearing, in which he preemptively argued that the victim's death is inherent in the offense. Given this record, the supreme court found the matter was not "a proper case for application of the waiver rule." *Saldivar*, 113 Ill. 2d at 266. The supreme court added, "[t]o preserve any error of the court made at that time, it was not necessary for counsel to interrupt the judge and point out that he was considering wrong factors in aggravation, especially in light of the argument that had preceded the ruling." *Saldivar*, 113 Ill. 2d at 266; see also *People v. Mitchell*, 152 Ill. 2d 274, 324 (1992) (holding that a defendant need not interrupt a trial court to correct a trial court's misapprehension after defense counsel has just argued the same to the court).

¶ 42     At the sentencing hearing in this case, respondent's attorney directed the court to section 5-750(1) of the Act (705 ILCS 405/5-750(1) (West 2020)). He noted that before a court can commit a juvenile to the Department, it must find, among other things, that placement there "is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive

alternative to secure confinement." See 705 ILCS 405/5-750 (West 2020). Respondent's attorney then argued that the State had not presented any information "about looking into less restrictive alternatives than [the Department] or any reasons why efforts were unsuccessful to locate those." Respondent's attorney also argued that an application of the factors set forth in section 5-750 of the Act supported a sentence of probation. These arguments adequately informed the trial court of respondent's position that secure confinement was inappropriate and that the record lacked evidence of the efforts made to locate less restrictive alternatives to secure confinement and the reasons why such efforts were unsuccessful. Quite simply, an objection during the pronouncement of the sentence would accomplish nothing under the circumstances. Consequently, as in *Saldivar*, we find that an objection at the sentencing hearing was not required to properly preserve this issue for review.

¶ 43     Additionally, as noted earlier, our supreme court has stated that the Act does not require a postadjudication motion to preserve an issue for review. *M.W.*, 232 Ill. 2d at 430. The State disputes this proposition, arguing that the cases respondent cites in support of it are distinguishable. However, even if a written motion asking the court to reconsider the sentencing order was necessary to preserve the issue, the trial court failed to properly admonish respondent in case No. 21-JD-73 regarding a motion to reconsider sentence. Illinois Supreme Court Rule 605(a)(3)(B) provides:

"(3) At the time of imposing sentence or modifying the conditions of the sentence, the trial court shall also advise the defendant as follows:

* * *

B. that prior to taking an appeal, if the defendant seeks to challenge the correctness of the sentence, or any aspect of the sentencing hearing, the defendant

must file in the trial court within 30 days of the date on which sentence is imposed a written motion asking to have the trial court reconsider the sentence imposed, or consider any challenges to the sentencing hearing, setting forth in the motion all issues or claims of error regarding the sentence imposed or the sentencing hearing[.]" Ill. S. Ct. R. 605(a)(3)(B) (eff. Oct. 1, 2001).

Rule 605(a)(3)(B) is applicable to proceedings involving delinquent minors by Illinois Supreme Court Rule 660(a) (eff. Oct. 1, 2001). With respect to case No. 21-JD-73, the trial court admonished respondent that he had the right to an appeal, but did not inform him that he needed to file a motion to reconsider his sentence in order to challenge his sentence on appeal. Respondent's attorney even remarked that the court "didn't admonish about the sentence appeal rights," but the court disagreed. Because the trial court did not provide respondent with the admonishments required under Rule 605(a)(3)(B), respondent's failure to file a postsentencing motion, to the extent one is required, does not bar consideration of the issue now raised on appeal. We therefore turn to the merits. See *People v. Henderson*, 217 Ill. 2d 449, 468 (2005) (holding that when a defendant receives insufficient Rule 605(a) admonishments about the role of a postsentencing motion in preserving sentencing error, the reviewing court may take "whatever action it deem[s] appropriate, including hearing the challenges itself or remanding them to the trial court").

¶ 44                                    B. Merits

¶ 45    Respondent contends that the court failed to comply with its duty under section 5-750(1) of the Act (705 ILCS 405/5-750(1) (West 2020)). That statute provides in relevant part as follows:

"[W[hen any delinquent has been adjudged a ward of the court under this Act, the court may commit him or her to the Department ***, if it finds that (a) his or her parents, guardian

or legal custodian are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement under Section 5-740 [of the Act (705 ILCS 405/5-740 (West 2020))], or it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent; and (b) *commitment to the Department of Juvenile Justice is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement.*" (Emphasis added.) 705 ILCS 405/5-750(1) (West 2020).

Furthermore, the Act provides that before a court commits a minor to the Department, it shall make a finding that secure confinement is necessary, following a review of the following individualized factors: (1) the age of the minor: (2) the minor's criminal background; (3) the results of any assessments of the minor; (4) the educational background of the minor; (5) the physical, mental, and emotional health of the minor; (6) community-based services that have been provided to the minor, whether the minor was compliant with the services, and the reason the services were unsuccessful; and (7) services with the Department that will meet the individualized needs of the minor. 750 ILCS 405/5-750(1) (West 2020).

¶ 46    As the foregoing illustrates, the statute ensures that the trial court treats commitment to the Department as a last resort. *Raheem M.*, 2013 IL App (4th) 130585, ¶ 53. To determine whether the trial court complied with the statute, we may look to the record for evidence concerning the statutorily required factors. See *In re Justin F.*, 2016 IL App (1st) 153257, ¶ 30. Nevertheless, a trial court "need not enumerate all possible alternatives when making a disposition [citation] and

the remarks of the trial court can illustrate a consideration of alternatives." *In re J.C.*, 163 Ill. App. 3d 877, 888 (1987).

¶ 47    Typically, we review a trial court's sentencing disposition for an abuse of discretion. *In re Griffin*, 92 Ill. 2d 48, 54 (1982); *In re M.Z.*, 296 Ill. App. 3d 669, 674 (1998). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). However, to the extent the issues presented concern whether the trial court complied with the statutory requirements, we are presented with a legal question to which we apply *de novo* review. *In re Ashley C.*, 2014 IL App (4th) 131014, ¶ 22. With the foregoing principles in mind, we turn to respondent's assignment of error.

¶ 48    As noted above, respondent argues that this case should be remanded for a new sentencing hearing because the trial court failed to comply with its duty under section 5-750(1) of the Act (705 ILCS 405/5-750(1) (West 2020)) and determine whether commitment to the Department is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful. Respondent observes that the trial court committed him to the Department despite its acknowledgment that there was no way to know if he would be successful on probation because he had never been previously sentenced to such a disposition. Moreover, respondent argues that the record establishes that he demonstrated a willingness to engage in the type of community-based services that are typically offered as a condition of probation. In this regard, respondent observes that he cooperated in the sex-offender-evaluation process and complied with the conditions of electronic monitoring. Respondent reasons that, given the lack of evidence that probation would not be successful and

that he would not comply with the conditions of probation, the trial court erred in committing him to the Department for an indeterminate term.

¶ 49     The State urges this court to reject respondent's claim of error. According to the State, the trial court was presented with ample evidence upon which to conclude that secure confinement was the least restrictive sentencing alternative for respondent. In support of its position, the State reiterates its contention that neither respondent nor his mother have taken the cases seriously. The State also cites respondent's problems with school, his attendance record for the sex offender evaluation, his lack of remorse, his unwillingness to engage in counseling and attend school, the risk to the community, and the fact that respondent committed an additional offense of child pornography (case No. 22-JD-35) while awaiting sentencing on the initial child pornography offenses (case No. 21-JD-73).

¶ 50     In pronouncing sentence, the trial court acknowledged that it did not know how respondent would comply with the requirements of probation since he had not been on probation before. Nevertheless, the court found that commitment to the Department was the least restrictive alternative "based on the evidence that efforts were made to locate a less restrictive alternatives [*sic*] to secure confinement and that those efforts would be unsuccessful." In its written sentencing order, the trial court elaborated that efforts to locate less restrictive alternatives to secure confinement were unsuccessful because (1) respondent "has not shown [a] willingness to engage [with] counseling or school"; (2) respondent "has shown [a] lack of remorse [and] accountability or [an understanding of] why he should engage in treatment/services"; and (3) respondent "has shown he is a risk to members of [the] community." After reviewing the record in this case, we find that while there was some evidence of the efforts made to locate a less restrictive alternative to secure confinement, there was no evidence to establish why such efforts were unsuccessful.

¶ 51    Regarding the identification of less restrictive alternatives to confinement, the trial court acknowledged that community-based services and probation are available to respondent. This finding is supported by the Report and the Evaluation. In the Report, Marseilles concluded that respondent needed counseling and services to assist him with getting caught up academically, to address his substance abuse, to minimize his risk-taking behaviors, to identify pro-social peers, and to address sexually problematic behavior. Marseilles added that "[a] term of probation is available to provide enforcement of the Court Order and referrals for supportive services." Similarly, the Evaluation recommended that respondent continue to engage in counseling as well as substance-abuse treatment and psycho-education about sex and sexuality. The Evaluation further recommended that respondent's family be involved and included in his treatment. The Evaluation also suggests (but does not expressly indicate) that ABC (the facility that conducted the sex-offender evaluation) offers some services that would meet respondent's needs. However, neither the Report nor the Evaluation indicates why these less restrictive services would be unsuccessful. Indeed, as the trial court recognized, respondent had never been sentenced to probation, so there was no way to know if he would comply with the requirements of probation.

¶ 52    Moreover, the reasons cited by the trial court that efforts to locate less restrictive alternatives to secure confinement were unsuccessful are not supported by the record. Noting respondent's poor attendance record at school and "attendance issues" with the sex offender evaluation, the court found that respondent had not shown a willingness to engage with counseling or school. To be sure, the Report stated that respondent had "some issues with attendance throughout the process of completing the [sex-offender] evaluation." However, an examination of the Evaluation itself does not bear this out. The Evaluation notes that respondent attended 11 sessions. Respondent's attendance was rated as "[g]ood." The Evaluation describes respondent as

a "friendly teenager" who was "cooperative, willing, and open with the evaluators." The Evaluation notes that respondent was "fully engaged in conversations," he "completed assessment tools when asked," he "appeared to be fairly *** honest," he would ask for clarification if he did not understand a question, and he "appeared to think critically before he answered" questions. While the Evaluation reports that respondent was "guarded with what information he was sharing" during early sessions, we do not think this unusual given respondent's age and the nature of the assessment. More significantly, the Evaluation notes that as the assessment progressed, respondent "became more comfortable answering questions that were specific to the allegations and the behaviors engaged in." Furthermore, respondent indicated that he planned to return to counseling after sentencing because there are topics he would benefit from processing in therapy. And while respondent was expelled from school for fighting and had attendance issues at RAS, Bloomington High School placed respondent on "homebound tutoring." Rountree's testimony, which was uncontradicted, was that respondent was indeed working with a tutor. We also point out that, during the Evaluation, respondent voiced a desire to return to school.

¶ 53 The trial court also found that efforts to locate less restrictive alternatives to secure confinement were unsuccessful because respondent had shown a "lack of remorse [and] accountability or [an understanding of] why he should engage in treatment/services." According to the Evaluation, however, this is not unusual as juveniles "often deny and/or minimize the full extent of their problematic behavior during the initial stages of counseling." Indeed, as noted in the preceding paragraph, although respondent was "guarded" during the initial sessions of counseling, he became more comfortable with the process as the counseling progressed and he indicated a desire to attend counseling in the future.

¶ 54    The trial court also found that efforts to locate less restrictive alternatives to secure confinement were unsuccessful because respondent "has shown he is a risk to members of [the] community." Although not entirely clear from the record, the basis for this finding appears to be the fact that respondent was charged with another child pornography offense (case No. 22-JD-35) after the adjudication of the initial child pornography offenses (case No. 21-JD-73). In this regard, the court expressed concern that giving respondent "another chance" could potentially result in "another victim [appearing] in front of [it]." However, as the trial court acknowledged, this is pure speculation. Moreover, while it is true that respondent committed another child pornography offense shortly after his adjudication on the initial pornography charges, we observe that respondent had not been sentenced in case No. 21-JD-73 at the time he committed the offense in case No. 22-JD-35. Thus, respondent was never given an opportunity to demonstrate that he could comply with community-based services or probation.

¶ 55    In its brief, the State continues to insist that neither respondent nor Rountree (his mother) "take rehabilitation seriously." As noted above, however, respondent regularly attended sessions for the sex-offender assessment, where he actively and openly participated. For her part, Rountree testified at the sentencing hearing that she had enrolled in counseling. This is evidence that both respondent and Rountree are, in fact, taking rehabilitation seriously.

¶ 56    The State also argues for affirmance based on *In re Ashley C.*, 2014 IL App (4th) 131014. In that case, the minor was adjudicated delinquent after pleading guilty in September 2013 to one count of residential burglary, two counts of burglary, one count of unlawful possession of a stolen or converted vehicle, and two counts of theft under $500. In addition, the minor's admission to the foregoing offenses served as the basis to revoke the minor's probation in three cases from 2011 and 2012 involving retail theft, unlawful consumption of alcohol, criminal trespass to a motor

vehicle, and burglary. The trial court committed the minor to the Department for an indeterminate term not to exceed her 21st birthday. On appeal, the minor argued that the trial court abused its discretion in committing her to the Department. This court rejected the minor's position. *Ashley C.*, 2014 IL App (4th) 131014, ¶ 30. We noted that the minor was on her fourth juvenile adjudication, the trial court had worked over the years to keep the minor in the community, and the trial court was familiar with the minor and the services both available and offered to her. *Ashley C.*, 2014 IL App (4th) 131014, ¶ 27. During this time, the trial court placed the minor on probation for five misdemeanors in two separate cases in 2011 and for felony burglary in 2012. *Ashley C.*, 2014 IL App (4th) 131014, ¶ 27. While on probation, the minor was evaluated four times for substance-abuse treatment, but left in-patient treatment against staff advice, missed appointments for her evaluations, and failed to complete evaluations because she was detained as a result of her criminal conduct. *Ashley C.*, 2014 IL App (4th) 131014, ¶ 27. In addition, respondent committed four new felonies while on probation. *Ashley C.*, 2014 IL App (4th) 131014, ¶ 27. The trial court was also familiar with the mental-health services in which the minor participated and the fact that, while on detention awaiting sentencing, respondent refused to leave her cell to attend school. *Ashley C.*, 2014 IL App (4th) 131014, ¶¶ 27-28. This court observed that "[a]fter making every effort to keep respondent in the community for over two years, the [trial] court recognized all local resources had been exhausted and the protection of the public necessitated [the minor's] incarceration." *Ashley C.*, 2014 IL App (4th) 131014, ¶ 28.

¶ 57    This case is clearly distinguishable from *Ashley C.* In this case, respondent, unlike the minor in *Ashley C.*, did not have a significant criminal history. Prior to the three cases involved at his sentencing hearing, respondent's only court disposition was for an ordinance violation in 2018. Moreover, unlike the minor in *Ashley C.*, respondent had not been previously ordered to participate

in community-based services or probation. Finally, we note that, when ordered to do so, respondent did cooperate in the preparation of the Report and the Evaluation. And, as noted above, his attendance at the sex offender evaluation was rated as good, and he openly and willingly participated in the process. *Ashley C.* therefore does not mandate a different result.

¶ 58    In short, we conclude that the trial court erred in committing respondent to the Department for an indeterminate term, not to exceed his 21st birthday. Significantly, respondent had never been on probation before, so there was nothing in his prior record to conclude that a less restrictive alternative to secure confinement would have been unsuccessful. Further, neither the Report, the Evaluation, nor the evidence presented at the sentencing hearing sets forth why less restrictive alternatives would have been unsuccessful.

¶ 59                                    III. CONCLUSION

¶ 60    For the reasons stated, we vacate the order of the circuit court of McLean County committing respondent to the Department and remand the cause for a new sentencing hearing.

¶ 61    Vacated in part; cause remanded with directions.